BOWEN W. SIMMONS, Retired Circuit Judge.
Appellant-defendant, an indigent on this appeal and at nisi prius, was tried pursuant to an indictment and convicted of robbery. The jury fixed punishment at twelve years imprisonment. This appeal is from a judgment duly entered.
The victim of the robbery was Mrs. Marcie Burkey. The subject of the offense was a 1972 Ford Pinto automobile that was in Mrs. Burkey’s possession. We will give details later in this opinion.
It appears that appellant-defendant, along with three other blacks, Peter (Potee) Frasier, David Floyd Glover, both males, and Frances Bascomb, a black female, originated a trip to Atlanta, via Montgomery, while they were in Huntsville, Alabama. Mrs. Bascomb was a close friend of Dr. John Logan Cashin, Jr., a black male dentist in that locality; and also very active in the civil rights cause for blacks.
Dr. Cashin, a witness for the State, testified in substance that Mrs. Bascomb enlisted his approval of the foursome taking part in a civil rights demonstration to be held in Mississippi or Atlanta, we are not sure which. He brought the foursome in his automobile to Montgomery on the. night of July 5, 1976; and also gave Mrs. Bascomb some money and let her have a four-barrel Derringer pistol at her request and for her protection. Dr. Cashin had no prior acquaintance with the three males, but rendered the service in reliance upon and at the request of Mrs. Bascomb. When they reached Montgomery he put them off at or near the Elks Club on Cleveland Avenue and he returned to Huntsville. He did not have further contact with the group and so far as the record indicates he was neither a *1012 party to the alleged robbery episode nor an aid or abettor thereto.
The genesis of the alleged robbery episode had its introduction when Mrs. Burkey, a white female, while driving her Pinto Ford, stopped in obedience to a traffic light located at the intersection of south Decatur and Arba streets, at the 1-85 overpass, whereupon a woman, identified as Mrs. Bascomb, and Potee Frasier “forced their way” into Mrs. Burkey’s car and “told me they wanted a lift to some street.” Mrs. Burkey did not know the name of the street. When the light turned, “I continued driving.” She testified:

“I told them that I couldn’t take them, because I had car trouble and that I didn’t want to give them a ride. But they wouldn’t get out of the car. So as we went on, we passed Ann Street, and we were approaching Perry Hill and I asked the man if that’s where I could let them off at. And he said, ‘Yes, this is the street.’ And so I pulled over, and I went past the exit and I was on the little side piece there, and I stopped the car, but I didn’t turn it off.”
Further, Mrs. Burkey said Frasier “pulled a gun on me” after indicating that I stop at Perry Hill road. She said that he “stuck the gun in my ribs and told me that it was a matter of life or death and to do exactly as he told me.” The gun was loaded. Mrs. Bascomb then got out of the car. Frasier directed “me to get in the back seat” at which time Frasier got out of the car. He stood between the door and the car and signaled. Two more men came to the car, one was the defendant, the other was Glover. Glover got in the front seat. Defendant got in the back seat. She said “I scooted all the way over towards the window.” She also said her car was a 1972 Pinto Run-about. Frasier said “I had to sit in the middle because I could make a scene or make some kind of distraction.” Frasier got in the back seat with the gun in the open and in plain view. The victim moved over as directed.
After the car started, “we were approaching a bridge and I got real hysterical and pleaded with Frasier and Young (defendant) to let me go.” The conversation was directed toward Frasier and defendant as follows:

“A. I told them that they could take the car if they would just leave me; and Frasier told me that I must think they are fools or something, because I would go report them to the police if they let me go. So they couldn’t let me go.

“A. So he told me that I had better calm down if I wanted to make it through it.
“Q. All right. How did you calm down?
“A. Well, I started crying.
“Q. What, if anything, did they do to calm you, if anything at all, to calm you down?
“A. Well, they both put their arms behind me and were holding me down.
“Q. They were holding you down?
“A. Yes.
“Q. In the back seat of that automobile?
“A. Yes.
“Q. Okay. What time of day was this?
“A. It was about 5:00 or 5:30.
“Q. Was it still light outside?
“A. Yes, it was light.”
It was on the interstate highway while Mrs. Bascomb was driving, that Frasier told witness about his involvement in murder and crimes and told her, in the presence of defendant, “that he would not think twice about killing me.” This was all in the presence of the defendant.
Relative to other conversation, the witness stated:
“Q. Now, was there any other conversation concerning you or your family in that car?
“A. Yes. Mr. Young asked me several questions concerning my family life, like my husband, what time would he be getting off work, when I would be missed; questions like that. He asked me what I did, if I worked.
“Q. Did he ask you what your husband
did for a living?
*1013 “A. Yes.
“Q. Okay. Was there any mention about the SLA or Patti Hearst in that automobile?
“A. Yes.
“Q. And in reference to that, what was said?
“A. Well, they just said that they were members of SLA and that they believed what happened to Patti Hearst was good. “Q. They said that they were members of the SLA and what happened to Patti Hearst was good?
“A. Um hum.
“Q. I’ll ask you if you can recall how long the car was in motion?
“A. I’m not positive.
“Q. Now, at any time in that time did Mr. Young reach for anything in his knapsack?
“A. Yes. After we had been on the road for awhile, they began passing around a bottle of booze that he had had. “Q. That who had had?
“A. Mr. Young.
“Q. What, if anything, did Mr. Young do while passing it at that time?
“A. They passed it to Frasier; and when Frasier went to give it to Bascomb, he took his arm away from around me. And so Young was the only one that had his arm around me.
“Q. And what, if anything, did Mr. Young do with his free hand?
“A. He pulled my leg down and he started to go up it and started to molest me.
“Q. And what, if anything, did Mr. Fra-sier say?
“A. He told him to stop, because it was making me upset and that it was visible to any oncomers that something was wrong in the car, and the back seat of the car was too small to do anything anyway. “Q. He said that the back seat of the car was too small to do anything anyway?”
Later, on 1-85, Frasier needed to relieve himself. The car was stopped. It was a straight shift and “stalled out.” They were not able to get it started again and it was getting dark.
After repeated efforts to get the car started without success, Frasier and defendant left to go back to a service station they had passed and get a service man. She was told not “to make any actions or display any kind of emotions to cause anybody to question what was going on.” At that time she did not know who had the gun. The service man left after trying unsuccessfully to get the car started. Frasier and Glover left to get somebody else to look at the car. She was left with Mrs. Bascomb and Young. Defendant was successful in stopping an automobile, a small car, but the car went on. Frasier and Glover returned with a service man whose name was Patrick Parsons. Frasier told witness not to say anything, and that if she did he would take care of her.
It was Parsons, who tried to get the car started and concluded that the gears were stripped. Then a Mr. Collier drove up.

“A. Well, he got out of his car and he asked if he could help, and everybody went over to talk to him except — I was told to stay in the car, and Glover stayed with me.
“Q. Glover stayed with you?
“A. Yes.
“Q. All right. What occurred then?
“A. Well, I couldn’t hear anything. The windows were up. I could see them. They were shaking hands, and there seemed to be a friendly conversation. Then I asked Glover if he would let me out to get some air. I thought maybe I could approach one of the men, the new man and maybe get away. And so Glover let me out of the car to get some air, and I started to walk towards them, and then he told me to go back to the car. And so I was told to sit back down, and I sat down in the driver’s seat.
“Q. You sat down in the driver’s seat?
“A. Yes.”
It was then, after some discussion, that Parsons agreed to take the blacks to Atlanta. They left, but Collier remained with the witness, Mrs. Burkey.
*1014 After the departure of Mr. Parsons and the foursome, Mrs. Burkey timidly, without knowing whether he was a friend or foe, approached Mr. Collier and learned that he was friendly. She told him her story. He took her to Auburn and they there informed the police what had happened. Suffice it to say that a police alarm went out on the air and the truck was stopped at a road block and all four blacks and Mr. Parsons were arrested.
Parsons testified that he was working part time then, July 6, 1976, at a service station. He identified defendant as one who came into the service station on July 6, 1976 with Potee Frasier. This was about forty miles from Montgomery. He testified that Frasier and defendant wanted him to come down and fix “our car.” He went with them. It was after dark. Mrs. Bur-key did not get out of the car; he attempted to talk to her because “The group — all members of the group kept me from talking directly with her.” He said that he attempted to get her away from the group;

“A. I tried to get them to let me take her up to the service station where I worked to call a tow truck to come and get the car off the highway before we left to go to Atlanta.
“Q. And did you do that?
“A. No, sir.
“Q. Why?
“A. Because they wouldn’t let me take her up.”
It appears that he took all of them away on his truck except Mr. Collier and Mrs. Burkey.
Parsons testified on cross-examination that he remembered specifically that defendant Young stated the car was his. He also said defendant and the others expressed a desire to take Mrs. Burkey with them but she said she wanted to stay with the car. He heard her talking.
The defendant elected to take the stand and testify.
He in substance denied his guilt. The trend was that he and Glover separated in Montgomery from Frasier and Mrs. Bas-comb and caught a ride to Perry Hill road where they were waiting when the other two and Mrs. Burkey drove up. He admitted coming to Montgomery from Huntsville in the car of Dr. Cashin. He denied getting any money or having any knowledge of a pistol. He contended he had no prior knowledge of any plan to force a ride on the part of Frasier and Mrs. Bascomb. He also denied knowledge of any of the circumstances involving Mrs. Burkey’s car. He denied putting his hands on Mrs. Burkey after he was picked up on 1-85; that he made no effort to do so. In fact, his testimony exonerated him from any part in intimidating or threatening Mrs. Burkey. He asserted he was free of any participation in the alleged robbery of Mrs. Burkey.
We have omitted much of the lengthy testimony, but suffice it is we have included sufficient evidence to give a fair picture of the episode and the defendant’s part as related by some of the witnesses.
Appellant insists, as we view his brief, that the alleged robbery occurred when Frasier and Bascomb intruded into the automobile at Arba and Decatur.
While these two persons were intruders and were unwanted riders in the automobile, we fail to observe that they manifested any attempt to take possession of or control over the automobile at that time.
We fail to find in the record any evidence of a conspiracy among Frasier, Bascomb, Glover and the defendant, Young, whereby control or possession of any automobile pri- or to Arba was contemplated.
The contention of defendant is that the four separated into pairs to facilitate their convenience in hitching rides to Atlanta. It is true that the foursome came to Montgomery as guest riders with Dr. Cashin and after he unloaded them, they were all together until they separated (in pairs) as above noted. But it would be mere suspicion arising out of their association that defendant and Glover ever conspired with Frasier and Bascomb to force possession and control over any automobile in furtherance of motor transportation to Atlanta.
*1015 Mrs. Burkey demurred to Frasier and Bascomb riding with her, but nevertheless, resumed driving her automobile with the unwanted guest aboard until she reached Perry Hill Road. She stopped at the Arba traffic light and turned east on that street which led to 1-85 east and along that interstate road until she reached Perry Hill Road. That is the point, as we read the record, where force and intimidation to gain possession and control of the automobile began, so far as the record before us shows. The testimony of Mrs. Burkey that she considered possession and control as having taken place at Arba was a conclusion on her part without foundation of fact as we view the record.
But the incident at Perry Hill Road is quite revealing and of factual importance.
Before we begin relating other incidents of intimidation, force or facts relating to the robbery charged in the indictment, we wish to point out what constitutes robbing one of a motor vehicle, namely, an automobile. Robbery is not defined in our Code. Title 14, § 415; Code 1940, fixes punishment for the offense. We must look to the common law offense of robbery. Thomas v. State, 91 Ala. 34, 9 So. 81, 82. Therein, Justice McClellan discusses the offense. He defines it to be “a felonious taking of money or goods from the person of another, or in his presence, against his will, by violence, or putting him in fear, and this violence must precede or accompany the stealing.” Hardis v. State, 28 Ala.App. 524, 189 So. 216, 217, holds that:
“. . . robbery is an offense against both person and property, and is briefly defined as the felonious taking of money or goods of value from the person of another, or in his presence by violence or by putting him in fear. Parks v. State, 21 Ala.App. 177, 106 So. 218. This would include the taking of an automobile from the possession of the owner under such circumstances as would constitute a felonious taking by violence or by putting him in fear.”
We further quote from Root v. State, 32 Ala.App. 253, 25 So.2d 180, as follows:
“Counsel for appellants argues strongly, and not without ingenuity, that the crime of robbery is incompletely established under the .facts of this case in that the owner of the automobile, Homer Lewis, was with the vehicle, in fact driving it, the entire time the appellants were in it, and therefore the requisite manucapture of another’s property by the defendants, essential to make out the crime of robbery, was lacking. The answer depends on whether the appellants were in possession of Lewis’ car.
“In his book, The Common Law, Mr. Justice Holmes writes ‘to gain possession, then a man must stand in a certain physical relation to the object and to the rest of the world, and must have a certain intent.’ This physical relation involves some degree of power over the object, and as a concomitant carries with it the power to exclude others from its use. See Holmes, supra, p. 220. Bare possession without control amounts to a mere custody. We need not concern ourselves with the element of intent, as this subjective element was included in the question of felonious intent found to be present by the jury.
“It is our opinion that the possessive or manucaptive element essential in robbery was present in this case. From the moment that these defendants and Lewis entered his automobile these appellants only were in full control and possession thereof. True, Lewis was present at all times. However, his status was that of a robot. His dominion over the automobile was completely negatived by the will and pistols of the appellants. It is our opinion that the facts of this case spell out that on the part of the appellants there was a felonious taking of property from the person of another, or in his presence, against his will, by violence or putting in fear. The fact that the owner was carried along against his will when the property was taken is incidental and should not affect the decision. . . . ”
With respect to intimidation as it relates to fear, we quote paragraphs 16(a), 77 C.J.S. Robbery, p. 459:
*1016 “ ‘Intimidation,’ as the word is used in the law of robbery, means putting in fear. In order to constitute robbery by intimidation, it is essential that the property taken be surrendered because of the apprehension of injury, and that the fear be that under compulsion of which the victim parts with his property. That fear essential to robbery must be caused by accused, intentionally, and not rise from the mere temperamental timidity of the victim. However, if there exists reasonable belief that injury will result from noncompliance with the robber’s demand, the necessary ‘fear’ is present.
“Degree of intimidation. The intimidation must be such as to cause a reasonable apprehension of danger. However, the fear aroused need not amount to great terror, panic, or hysteria. It is necessary and sufficient that the fear is strong enough to overcome the victim’s resistance and induce him to part with the property under its compulsion.”
It appears from the evidence of the alleged victim, Mrs. Burkey, that on reaching Perry Hill Road, the two riders told her to stop, which she did. Frasier pulled a gun on her and stuck it into her ribs and told her that it was a matter of life or death and to do exactly what he told her to do. She identified exhibit number 3, the four-barrel .22 Derringer pistol as the gun he stuck in her ribs. He showed her it was loaded. Mrs. Bascomb got out of the car, on the passenger side. Frasier instructed the witness to get in the back seat. He stood between the door of the car and the entrance and signaled. The defendant and Glover came to the car. Defendant got into the back seat with the witness. She scooted toward the window. Frasier said that she was next to the window. In the presence of the defendant, Frasier directed her to get in the middle, which she did. Defendant said “all right,” and let her move into the middle. Glover got into the front seat with the other woman who did the driving. Frasier was in the back seat and had the gun out in the open.
It further appears that while enroute after Glover and defendant got in the car, the victim got hysterical and pleaded with Fra-sier and defendant to let her go.

“A. I told them that they could take the car if they would just leave me; and Frasier told me that I must think they are fools or something, because I would go report them to the police if they let me go. So they couldn’t let me go.

“A. So he told me that I had better calm down if I wanted to make it through it.
“Q. All right. How did you calm down?
“A. Well, I started crying.
“Q. What, if anything, did they do to calm you, if anything at all, to calm you down?
“A. Well, they both put their arms behind me and were holding me down.”
It appears that at a certain point on 1-85, the car was stopped to let Frasier accommodate himself to a physical necessity. It was then that they were unable, after much effort, to get the car in forward or reverse motion again. Two of the men went to a nearby filling station where they procured the services of an attendant, Leroy Parsons, who also failed to get the car in gear.
Parsons testified that the defendant and Frasier told him that the automobile belonged to them. He was unable to communicate with the victim because the foursome secluded her from communication.
Finally, Parsons was importuned and agreed to take them to Atlanta on his truck, leaving the victim at the car with a Mr. Collier who also had come up and offered to help get the car started. After the truck left bearing the foursome, Burkey found that she could trust Collier and told him her story. He took her to Auburn where they communicated with the Auburn police. These officers put out a dispatch to look out for the truck. The truck was spotted and was stopped by a road-block. The foursome plus Parsons were all arrested.
At the trial of this case, Parsons and Collier testified for the State. Parsons had *1017 moved to Ohio, at which point he found the pistol, exhibit number 3, under the front seat of the truck. He turned it in to the police in Ohio. The pistol was sent by registered mail to Montgomery, and after proper identification, was lawfully admitted in evidence.
It appears to us from the record that after the car was stopped at Perry Hill Road, when and where Frasier signaled Glover and defendant, and they appeared on the scene, there was frequent intimidation and an atmosphere of fear created by Frasier and defendant, continuing until the Parson truck left the scene to take the foursome to Atlanta. The fear and intimidation was continuing to which the defendant made a contribution and was a well-wisher. It appears to us that he aided and abetted in creating fear and intimidation from the time he appeared on the scene at Perry Hill Road until the Parson truck left. Title 14, § 14, Code of Alabama, Recompiled 1958. He even tried to put his hands on Mrs. Burkey in a manner to have sexual contact with her. He was warned by Frasier that he could not do that in the car.
It appears that Frasier was the leader of the foursome; that defendant was a willing aid and abettor in placing Mrs. Burkey in fear that induced her to obey orders of Frasier and surrender control and dominion of her Pinto automobile. We think that defendant’s conduct and obedience to the instruction of Frasier indicate and support a factual inference that he knew that Mrs. Burkey was a victim of fear and intimidation created by Frasier and that she was being deprived of her automobile at gunpoint. Also, from his conduct, words and willingness to co-operate in furtherance of the deprivation of the car it could reasonably be inferred that he was aiding and abetting Frasier and the other two in carrying out the scheme. He knew full well that the automobile did not belong to Frasier; that it had been in possession of Mrs. Bur-key prior to possession being taken at pistol-point. The incidents, conduct of this defendant from Perry Hill Road to the departure of the foursome with Parsons, sheds light on his knowledge of the robbery and his willing co-operation in the affair. It is true the actual possession of the car took place at Perry Hill Road but the deprivation by intimidation and fear was a continuing affair in which the defendant was a satellite and willing actor. He aided and abetted. Title 14., § 14, Code of Alabama, supra.
We hold that defendant was not entitled to any written or oral instructions that denied the jury the right to pass upon his guilt or innocence. The judgment is affirmed.
The foregoing opinion was prepared by the Honorable BOWEN W. SIMMONS, a retired Circuit Judge, serving as a Judge of this Court, under the provisions of § 6.10, of the new Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.