1999 UT App 123

**STATE of Utah, Plaintiff and Appellee,**

v.

**Philip E. HOLLEN, Defendant
and Appellant.**

No. 981128–CA.

Court of Appeals of Utah.

April 22, 1999.

Karen Stam and Catherine E. Lilly, Salt Lake Legal Defender Association, Salt Lake City, for appellant.

Jan Graham, Attorney General and Catherine M. Johnson, Assistant Attorney General, Salt Lake City, for appellee.

Before Judges BENCH, JACKSON, and ORME.

## OPINION

ORME, J.

¶ 1 Appellant Philip E. Hollen, one of the Million Dollar Saloon "clown bandits," challenges his conviction for aggravated robbery, a first degree felony, in violation of Utah Code Ann. § 76–6–302 (1995).[1] We reject his contention that the evidence was insufficient to sustain the "taking" element of a robbery offense and affirm his conviction.

## BACKGROUND

¶ 2 On appeal from a jury verdict, we recite the facts and draw inferences in the light most favorable to the verdict. *See State v. Brandley*, 972 P.2d 78, 79 (Utah Ct.App. 1998); *State v. Gibson*, 908 P.2d 352, 354 (Utah Ct.App.1995), *cert. denied*, 917 P.2d 556 (Utah 1996).

¶ 3 In the early hours of September 24, 1995, two men, later identified as Hollen and Jeffrey Devon Mecham, set about to enrich themselves at the expense of the Million Dollar Saloon. The two arrived at the saloon just after it closed at around 2:00 a.m., quickly donned homemade clown costumes (baggy pants with "magic marker" polka-dots and, in preference to the more traditional clown make-up, actual clown masks), grabbed some

---

1. Although the jury also found Hollen guilty of two counts of aggravated assault, third degree felonies under Utah Code Ann. § 76–5–103 (Supp.1998), and lesser included offenses of the two originally charged counts of attempted aggravated murder, he does not appeal those convictions.

roses, and proceeded to the saloon's west entrance. After hearing the doorbell, a bartender opened the door and the pair entered. Upon entering, the clowns began handing out roses to those employees and their guests still inside the saloon.

¶ 4 Suspecting from the quality of the costumes, the hour, and the peculiar flower giveaway that some mischief was afoot, a dancer at the saloon slipped to the front lobby and called 911. Meanwhile, the bouncer, Walter Finley, and the manager, Chris Stanley, approached the clowns and asked them to leave. As Finley and Stanley escorted the clowns to the door, one clown (determined later to be Hollen) turned around, pointed a gun in their faces, called Finley by his nickname, "Tex," and said they were going to rob the place. The other clown ordered the saloon's remaining occupants to move to the area of the "buddy bar" and get down on the floor.

¶ 5 Hollen learned that Stanley was in charge and asked him where the saloon kept its money. Stanley answered that the money was kept in the back room, and the clowns ordered the occupants to move toward that area, which they did. Stanley testified that Hollen "pointed the gun towards my face and told me ... he wanted to get the money, and that if I gave him any trouble, that he was going to pop me." As the other clown watched the remaining occupants, Hollen directed Stanley into the back room.

¶ 6 Hollen entered the back room first and gave Stanley a black nylon tote bag. As Stanley recounted, Hollen "instructed me to open the safe. I opened the safe. [He] told me to put the money in the bag. I started to ... put the money in the bag." Stanley then placed approximately $3,000 in the bag from one of three safes. When Hollen noticed two additional safes, he told Stanley to open them. As Stanley was explaining that he was new and unable to open the other safes, the phone rang. At Hollen's direction, Stanley answered the phone. A Sheriff's Department dispatcher was on the line and informed Stanley that an officer was outside and that he should open the building's west door. Stanley said he was unable to comply at that time and hung up. Hollen asked who

was on the phone and placed the gun to the side of Stanley's head to expedite an answer. Stanley replied, "That was the Sheriff's Department on the phone. They are outside and they know that you're here." With this unwelcome news, Hollen panicked a bit and took Stanley back to where the others were waiting. The bag of money, however, was left in the back room, and Hollen never personally touched it.

¶ 7 Subsequent events do not bear on the single issue on appeal in this case, although it should be mentioned that as the clowns tried to get away, a gun battle ensued in which both Hollen and Sheriff's Sergeant Michael Julian were wounded. A trail of clown wear led eventually to the discovery of Mecham in a nearby dumpster. In an ambulance en route to the hospital, Hollen admitted that he was the clown who took Stanley to the back room.

¶ 8 The State charged Hollen with, inter alia, one count of aggravated robbery in an information which read, in relevant part, as follows:

> AGGRAVATED ROBBERY, a First Degree Felony, ... on or about September 24, 1995, in violation of Title 76, Chapter 6, Section 302, Utah Code Annotated 1953, as amended, in that the defendants JEFFERY DEVON MECHAM and PHILIP EARL HOLLEN, as parties to the offense, unlawfully and intentionally took personal property in the possession of Million Dollar Saloon from the person or immediate presence of the manager of Million Dollar Saloon....

At trial, after the close of evidence, the jury was similarly instructed that to find Hollen guilty of aggravated robbery, it must find beyond a reasonable doubt that he unlawfully and intentionally "took" the saloon's money. The instructions did not define "took," and Hollen neither objected to this omission nor offered a definition of his own. The jury found Hollen guilty of aggravated robbery. Hollen appeals.

## ISSUE AND STANDARD OF REVIEW

¶ 9 Hollen requests reversal of his aggravated robbery conviction, arguing the evi-

dence was insufficient to support a finding that he "took" property as described in the information.

> "When examining the sufficiency of the evidence in a criminal jury trial, we begin with the threshold issue of statutory interpretation, which we decide as a matter of law. With regard to the facts, 'we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury.' Under this standard, we will reverse a conviction only when the evidence, viewed in light of our interpretation of the statute, 'is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he [or she] was convicted.'"

*State v. Fisher*, 972 P.2d 90, 97 (Utah Ct. App.1998) (alteration in original) (citations omitted).

## ANALYSIS

¶ 10 Our Legislature has defined aggravated robbery as using or threatening to use a dangerous weapon in the course of committing a robbery. *See* Utah Code Ann. § 76–6–302 (1995). "A person commits robbery if ... the person unlawfully and intentionally *takes or attempts to take* personal property in the possession of another from his person, or immediate presence, against his will, by means of force or fear...." Utah Code Ann. § 76–6–301(1)(a) (Supp.1998) (emphasis added). Assuming, without deciding, that his conviction may stand only if Hollen completed the taking,[2] we conclude such taking was complete when he exercised control over the $3,000 by threatening deadly force and causing the manager to remove the money from the safe and place it in the bag.

¶ 11 This court recently interpreted an earlier version of section 301 in resolving a similar challenge. *See In re D.B.*, 925 P.2d 178, 180–82 (Utah Ct.App.1996). In *D.B.*, the juvenile defendant argued he had not committed robbery because the victim voluntarily gave the defendant initial possession of the property and the defendant used no force or intimidation until the victim asked for the property's return. *See id.* at 179, 181. This court rejected that argument, holding that for robbery, the use of force or fear may occur "at any time prior to or concurrent with" the taking. *Id.* at 181–82. In so ruling, we essentially equated the victim's loss of the ability to exercise control over the property with a taking for purposes of the robbery statute. *See id.* at 181 ("[T]here is no 'taking' from the immediate presence of another until the victim loses the ability to exercise control over the property.").

¶ 12 This court was not asked in *D.B.* whether the exercise of control consummating a taking necessarily includes some physical touch or literal manual possession by the defendant. Many other courts have understandably concluded that it does not. *See, e.g., Young v. State*, 347 So.2d 1011, 1015 (Ala.Crim.App.1977) (Although the robbery victim " 'was present at all times[,] ... his status was that of a robot [and h]is dominion over the automobile was completely negatived by the will and pistols of the appellants.' ") (citations omitted); *State v. Hitchcock*, 87 Ariz. 277, 350 P.2d 681, 686 (1960) ("[E]vidence that the articles were removed from the victim's office at gun point by the direction of defendant is a sufficient taking to sustain the conviction of robbery under the statute."), *cert. denied*, 365 U.S. 609, 81 S.Ct. 823, 5 L.Ed.2d 821 (1961); *State v. Aro*, 188 Ariz. 521, 937 P.2d 711, 714 (Ct.App.1997) ("[W]e conclude that 'taking' under the present robbery statute means obtaining possession of or dominion over property, and does not require that the property be moved."); *People v. Quinn*, 77 Cal.App.2d 734, 176 P.2d 404, 405 (1947) (Robbery "requires the taking

---

**2.** While he concedes the evidence was sufficient to convict him under the broader statutory definitions, which do not require a completed taking, *see State v. Hickman*, 779 P.2d 670, 671–72 (Utah 1989) (per curiam); *In re D.B.*, 925 P.2d 178, 181–82 (Utah Ct.App.1996), Hollen argues the State is bound by the information, which described his culpable conduct as involving a com-

pleted taking with no mention of the "attempts to take" phraseology. However, because we conclude the evidence was sufficient to prove that Hollen indeed completed a taking as alleged in the information, we need not consider this argument further, other than to note that a similar argument was recently treated in *State v. Preece*, 971 P.2d 1, 4–6 & n. 8 (Utah Ct.App.1998).

of personal property . . . but does not require that this be done by the use of the hands of the person doing the taking."); *People v. James*, 981 P.2d 637, —— (Colo.Ct.App.1998) ("[I]t has uniformly been held that, for purposes of the crime of robbery, the required 'taking' need not be accomplished by the personal asportation of the robber. Rather, if the robber forces another to 'take' the property, a robbery has occurred."); *Johnson v. State*, 432 So.2d 758, 759 (Fla.Dist.Ct. App.1983) ("[I]t is not necessary that the property be taken into the hands of the robber. . . ."); *State v. Beatty*, 617 S.W.2d 87, 90 (Mo.Ct.App.1981) ("It is no less a taking simply because the property is physically taken and moved by another person, even the victim who acts only under the robber's direction and control."). As a leading treatise explains, "[i]n no event is it necessary that the defendant take manual possession of the property; he need only assume control of the property." 4 *Wharton's Criminal Law* § 457, at 14 (15th ed.1996). *See also Black's Law Dictionary* 1453 (6th ed. 1990) ("The element of 'taking' in robbery does not require robber's manual possession of property; it is sufficient if robber has acquired dominion and control over property."). We readily agree with this persuasive authority.

¶ 13 Here, the evidence shows that although Hollen did not personally remove the money from the safe or place it in his bag, he accomplished the same end when he coerced this very conduct from Stanley at the point of a gun. We see no appreciable difference between the control Hollen would have exercised had he removed the money from the safe personally and the control he exercised by directing Stanley.[3] In following the authority outlined above, we avoid the "strange result" where "differing scenarios which are based on the same action, the same intent, and the same danger to other people would lead to differing crimes and penalties." *D.B.*, 925 P.2d at 181–82. *Cf. State v. Lopez*, 520 P.2d 213, 213 (Utah 1974) ("[T]he defendant's actions and intent and the custodial features involved here impress us with a conclusion that technical touching and taking or asportation and such are minutiae, and should not be dispositive of the clear import of the statute. . . ."). Accordingly, we hold defendant Hollen completed the requisite taking for purposes of the charged aggravated robbery.

## CONCLUSION

¶ 14 We reject Hollen's claim that the evidence was insufficient to support the jury's verdict that he was guilty of aggravated robbery as alleged in the information filed against him. The evidence clearly showed, and Hollen does not dispute, that he directed the manager, at gunpoint, to remove money from the safe and place it in a bag. In so doing, Hollen exercised the requisite control over the Million Dollar Saloon's property to complete the element of taking as required by statute and described in the information.

¶ 15 Affirmed.

¶ 16 We CONCUR: RUSSELL W. BENCH, Judge and NORMAN H. JACKSON, Judge.

---

3. It would certainly have been appropriate for the trial court to instruct the jury to employ this broad definition of "taking." However, Hollen may not predicate reversible error on this omission when he failed to either object below or offer an instruction with such a definition. *See State v. Kiriluk*, 975 P.2d 469, 476, 362 Utah Adv.Rep. 19, 23 (Utah Ct.App.1999) (holding issue of omitted jury instruction was not preserved below and was invited error, outside the manifest injustice exception, where defendant failed to object or provide the instruction). Moreover, the omission, if anything, was to Hollen's advantage because without the jury being instructed about the appropriately broad definition of "taking," Hollen at least had a shot at the jury employing a more literal, restrictive definition and acquitting him on that basis. Had it been more fully instructed about what "taking" means in this context, Hollen's conviction would only have been more certain. Thus, any error in not giving such an instruction would be harmless in this case.