2000 Utah Ct. App. 247

**STATE of Utah, Plaintiff and Appellee,**

v.

**Jeffery Devon MECHAM, Defendant and Appellant.**

No. 971013–CA.

Court of Appeals of Utah.

Aug. 17, 2000.

Laura K. Thompson, Patterson & Barking, Ogden, for Appellant.

Jan Graham, Attorney General, and Scott Keith Wilson, Assistant Attorney General, Salt Lake City, for Appellee.

Before Judges BENCH, DAVIS, and ORME.

## OPINION

ORME, Judge:

¶ 1 Defendant Jeffery Devon Mecham was convicted by a jury of aggravated robbery, a first degree felony, in violation of Utah Code Ann. § 76–6–302 (1999), and aggravated kidnaping, a first degree felony, in violation of Utah Code Ann. § 76–5–302 (1999). Mecham appeals the convictions, claiming ineffective assistance of counsel, and that the trial court erred in not merging the two convictions. We affirm.

## BACKGROUND

¶ 2 On May 29, 1998, the trial court held an evidentiary hearing after this court remanded, pursuant to Rule 23B of the Utah Rules of Appellate Procedure, so the trial court could enter findings of fact regarding Mecham's ineffective assistance of counsel claim. We defer to the trial court's findings of fact regarding ineffective assistance of counsel. *See State v. Bredehoft,* 966 P.2d 285, 289 (Utah Ct.App.1998), *cert. denied,* 982 P.2d 88 (Utah 1999). We view and recite all other facts regarding the kidnaping and robbery in the light most favorable to the jury verdict. *See State v. Loose,* 2000 UT 11, ¶ 2, 994 P.2d 1237.

¶ 3 At approximately 1:00 a.m. on June 25, 1995, two men, identified months later as Mecham and Phillip E. Hollen, sought to enrich themselves at the expense of the Cinemark 10 movie theaters in Layton, Utah. The robbers entered the theater during the "midnight movies," shown in several of the ten theaters, which share a common lobby. Three female concessions employees were closing and cleaning up, one at the front and the other two in the back kitchen area. Two managers were upstairs reconciling the books for the day, and two ushers were walking through the already empty theaters to make sure everyone was gone and to retrieve any items forgotten by the departing patrons. A dark-haired man with a gauze bandage taped to his left cheek entered the back kitchen area brandishing a .22 caliber semi-automatic hand gun, and pointed it at the two workers. They were instructed to look at the floor. The dark-haired robber asked the employees where they kept the money and was told it was upstairs, in the manager's office. When he asked about other employees, he was told about the managers and ushers.

¶ 4 Just then the third concessions worker walked to the back kitchen area and was forced to join her co-workers. The third concessions worker, upon entering the area, saw the second robber standing silently in the room. The second robber apparently had entered at some point after the dark-haired robber began his dialogue with the employees. The second robber was described as blond and wearing cowboy boots, brandishing a weapon, and sporadically attempting to conceal his face with the collar of his turtleneck.[1]

¶ 5 The three concessions employees, escorted by the dark-haired robber, went upstairs, proceeded down the hall, and knocked on the door to the manager's office, which was locked. One of the managers looked through the peephole, saw the three employees without seeing the robber, and opened the door. The robber quickly escorted the three women inside.

¶ 6 The dark-haired robber threw a bag to one of the managers and told him to fill it with money. The manager put the money he had been counting in the bag and then opened the safe and emptied its contents into the bag. The blond robber joined the group, and the two robbers took packing tape and, while telling the employees, "everything's go-

---

1. While never "masters of disguise," Hollen and Mecham became somewhat more adept at concealing their identities as they advanced in their criminal careers. *See, e.g., State v. Hollen,* 1999 UT App 123, ¶ 3, 982 P.2d 90.

ing to be fine, nobody is going to get hurt, just like in the movies," taped up the employees, securing their hands behind their backs. They told the employees not to do anything for ten minutes, and left temporarily.

¶ 7 Meanwhile, one of the two ushers, after clearing the empty theaters and taking a bathroom break, noticed the concessions employees had abandoned their posts without finishing their work. He then heard movement at the top of the stairs. He hollered the name of the other usher to see if it was him. Instead, the blond robber leaned out from the stairway on the second floor and pointed his gun at the usher. The blond robber quickly descended the stairs and forced the usher upstairs, where he joined the other usher who had already been located by the robbers and taken to the top of the stairs. The robbers then forced the two ushers into the manager's office, taped the ushers' hands, and then left for good, leaving all of the theater employees bound. The robbers escaped with over eleven thousand dollars in cash. A few minutes after the robbers left, the employees freed themselves by breaking the tape and promptly called the police.

¶ 8 In the ensuing investigation, two suspects other than Mecham and Hollen were initially considered by the police. One was dark complected and had recently been seen wearing a bandage on his cheek matching the one described by the witnesses. The Layton Police Department assembled a black and white photo lineup that included a picture of this suspect. Two of the seven witnesses picked this individual's photo and identified it as looking like one of the robbers. One witness had a frightened emotional reaction when shown a color photo of the suspect. However, during a physical lineup, while the suspect was identified by one witness as looking and sounding the "most like" the robber with the bandage, there was no positive identification and the suspect was released.

¶ 9 A photo lineup of the second suspect also failed to produce a positive identification, and he, too, was released. The investigation by the Layton Police Department appeared to be at a dead end. No physical evidence had been left at the scene, and there were no other apparent suspects.

¶ 10 Four months later the Layton Police Department was contacted by the Salt Lake City Police Department and given the names of Mecham and Hollen as suspects because of similarities between the Cinemark 10 robbery and other robberies in Salt Lake City for which the two defendants had already been arrested. A photo lineup of Hollen and a separate photo lineup of Mecham were prepared and presented to the witnesses. All seven witnesses identified Hollen as the dark-haired robber with the gauze patch. Four of the seven identified Mecham as the blond robber with the cowboy boots; the other three witnesses never saw the blond robber well enough to even attempt to identify him. Mecham and Hollen were subsequently charged.

¶ 11 A public defender was appointed to represent each defendant. The two attorneys worked closely together and discussed in detail both the case law involved and the strategy they intended to employ. Both received copies of all police reports and witness statements.

¶ 12 At a preliminary hearing, the attorneys cross-examined the Layton police officer who had conducted the photo lineup. The attorneys were also able to view the actual photo array used to identify their clients. The officer testified that the array was presented to each witness out of the presence of the other witnesses and in no particular order. All the pictures used in the photo lineup were of similar dimensions and the subjects were of the same general appearance. The photos were not suggestive towards Mecham and Hollen, who were bound over for trial at the conclusion of the preliminary hearing. Both defendants later appeared in court for arraignment and entered pleas of not guilty.

¶ 13 Sometime before trial, Mecham's attorney received a handwritten letter from Mecham which discussed filing a motion to suppress the identification of him by the witnesses who attended the preliminary

hearing[2] and to challenge the reliability of the eyewitness identification of all the witnesses. Mecham sought the exclusion of the eyewitness identifications because of the fundamental unreliability of eyewitness identification as discussed in *State v. Ramirez*, 817 P.2d 774, 778–81 (Utah 1991), and *State v. Lopez*, 886 P.2d 1105, 1110–11 (Utah 1994).[3] Mecham's attorney discussed the letter with Hollen's attorney, and both were familiar with the *Ramirez* and *Lopez* standards. Mecham's attorney discussed Mecham's suggestions with him in person. He explained that some of Mecham's suggestions would not "fly," but that he would look into the others.

¶ 14 Mecham's attorney personally inspected the scene of the robbery, where he met with the prosecutor and five of the seven witnesses. He interviewed the witnesses about their observations as well as the circumstances and sequence of those observations. He observed the physical layout and lighting of the crime scene and even used a stop watch to run time calculations on various aspects of the robbery. The two defense attorneys again met and discussed all the information gleaned during this visit.

¶ 15 Understanding what *Ramirez* and *Lopez* required, both attorneys concluded they had little or no chance of success if they tried to suppress the identifications made by the witnesses. Their personal investigations revealed that the Layton Police Department's photo lineup was not unduly suggestive and that the identifications by the witnesses showed a high degree of certainty. They reasoned that filing a motion under such circumstances would only have the effect of educating the prosecution more about their defense theory and, in the evidentiary hearing likely to follow, give the already strong identification witnesses yet another chance to rehearse their testimony and further solidify their identifications of the two defendants.

¶ 16 Thus, as a tactical matter, the attorneys chose not to file a motion to suppress the identifications, despite the earlier misidentification of an uninvolved suspect by a couple of the witnesses, and intended instead to rely on the *Long* instruction regarding the general untrustworthiness of eyewitness identification. *See State v. Long*, 721 P.2d 483, 488–92 (Utah 1986) (concluding that, if requested, trial court must give cautionary eyewitness identification instruction in every case where identification is central because research shows that juries have fundamental misunderstanding of level of reliability of eyewitness identifications and consequently tend to give them undue weight). The *Long* instruction was indeed requested and given to the jury at trial.

¶ 17 Mecham and Hollen were charged with aggravated robbery, aggravated kidnaping, and aggravated assault. At trial, defense counsel argued that the three crimes were actually a single instance of robbery, and that the kidnaping and assault merged into the robbery and could not be charged as separate crimes. *See* Utah Code Ann. § 76–1–402(3) (1999). The prosecutor agreed to drop the aggravated assault charge on this rationale, but argued that the defendants' restraint of the employees went beyond that of a typical robbery. The trial court agreed, stating:

> In this matter the [employees] are essentially kidnaped in the lower story of the building. They are taken against their will up to the upper story and held there for a substantial period of time, certainly during the course of that robbery. They ... bound them and left them there ... not knowing when or where they would be ... released. That is not typically the kind of robbery where [robbers] go in and take the property and leave immediately without binding or in anyway detaining them. I think the factual difference is significant.

2. Apparently, various witnesses to the robbery were present at the defendants' preliminary hearing as spectators. The attorneys were not aware of the identity of the witnesses present at the hearing but filed a motion in limine to exclude any identification stemming from the preliminary hearing. That motion was granted.

3. Mecham apparently has no formal legal training, but rather came by his keen legal insights in the course of rather extensive "hands on" experience with the criminal justice system. *See, e.g., State v. Hollen*, 1999 UT App 123, 982 P.2d 90.

¶ 18 After a jury trial, both Hollen and Mecham were found guilty of aggravated robbery and aggravated kidnaping. Mecham appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 19 Mecham argues that his court-appointed defense attorney rendered ineffective assistance of counsel in not moving to suppress the eyewitness identification testimony as unreliable. "Ineffective assistance of counsel claims present a mixed question of law and fact." *Parsons v. Barnes*, 871 P.2d 516, 518 (Utah), *cert. denied*, 513 U.S. 966, 115 S.Ct. 431, 130 L.Ed.2d 344 (1994). At Mecham's request, this court remanded for a Rule 23B hearing where the trial court made findings of fact with regard to his ineffective assistance claim. "In ruling on an ineffective assistance claim following a Rule 23B hearing, 'we defer to the trial court's findings of fact, but review its legal conclusions for correctness.'" *State v. Bredehoft*, 966 P.2d 285, 289 (Utah Ct.App.1998) (quoting *State v. Classon*, 935 P.2d 524, 531 (Utah Ct.App. 1997)), *cert. denied*, 982 P.2d 88 (Utah 1999).

¶ 20 Mecham also argues the trial court incorrectly denied his motion to merge the aggravated robbery and aggravated kidnaping charges in light of this court's opinion in *State v. Finlayson*, 956 P.2d 283 (Utah Ct.App.1998), and the Utah Supreme Court's more recent opinion in *State v. Finlayson*, 2000 UT 10, 994 P.2d 1243.[4] This is essentially an issue of statutory construction that we review for correctness, according no particular deference to the trial court. *See State v. Harmon*, 910 P.2d 1196, 1199 (Utah 1995); *Zissi v. State Tax Comm'n*, 842 P.2d 848, 852 (Utah 1992).

## ANALYSIS

### A. Ineffective Assistance of Counsel

¶ 21 Mecham argues his trial counsel was ineffective for failing to seek a hearing under *Ramirez* to test the reliability of the eyewitnesses and, hopefully, to exclude their testimony from trial. To prevail on a claim of ineffective assistance of counsel, Mecham must show that (1) trial counsel's performance was objectively deficient and (2) there exists a reasonable probability that absent the deficient conduct, the outcome would likely have been more favorable to Mecham. *See Strickland v. Washington*, 466 U.S. 668, 687–88, 693, 104 S.Ct. 2052, 2064, 2066–67, 80 L.Ed.2d 674 (1984); *State v. Bryant*, 965 P.2d 539, 542 (Utah Ct.App. 1998). "[B]ecause a defendant has the burden of meeting both parts of the *Strickland* test, it is unnecessary for this court to apply both parts where our inquiry reveals that one of its parts is not satisfied." *State v. Marvin*, 964 P.2d 313, 315 (Utah 1998).

¶ 22 Before we will reverse Mecham's conviction based on ineffective assistance of counsel, he must prove there was a "'lack of any conceivable tactical basis' for counsel's actions." *State v. Garrett*, 849 P.2d 578, 579 (Utah Ct.App.) (quoting *State v. Moritzsky*, 771 P.2d 688, 692 (Utah Ct.App. 1989)), *cert. denied*, 860 P.2d 943 (Utah 1993). We "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065 (citation omitted). *Accord Bryant*, 965 P.2d at 542. A careful review of defense counsel's actions of record appears to supply "a rational basis for counsel's performance," and it would likely be correct to "assume counsel acted competently." *State v. Tennyson*, 850 P.2d 461, 468 (Utah Ct.App. 1993).

¶ 23 We have, however, the added benefit in this case of counsel's own detailed explanation of his tactics, provided by him at the Rule 23B hearing, and the trial court's findings made pursuant to that rule. After looking into all the circumstances surrounding the identification of Hollen and Mecham, viewing the photo array, questioning the officer who prepared and presented the array,

---

4. The parties' briefs made reference only to the Utah Court of Appeals' *Finlayson* opinion. The Utah Supreme Court's *Finlayson* opinion was issued after the parties' briefs were submitted but before oral argument. Both opinions were discussed at argument.

interviewing five of the witnesses, and spending time at the scene of the crime, Mecham's counsel concluded, as restated in the trial court's findings, that

> a motion to suppress had little chance of success.... [Counsel for both defendants] felt that the filing of such a motion would only have the effect of educating the prosecution more about their theory of defense and give already strong identification witnesses yet another chance to rehearse their testimony and further solidify their identification of the defendants.... [Instead, counsel believed they could present] the shortcomings of eyewitness identification ... effectively with a cautionary jury instruction on eyewitness identification.

In fact, Mecham's counsel had some success in impeaching and undermining the witnesses' identification at trial.[5] In our view, trial counsel had sound strategic reasons for not doing as Mecham requested.

¶ 24 Mecham's claim presents us with a unique issue, however, because of the letter he sent to his attorney *specifically requesting* a hearing to suppress the identifications. His counsel chose not to honor his request, but he did discuss his reasoning with Mecham. Under the Rules of Professional Conduct, there are certain decisions that must be made by the client. These include whether to accept a plea arrangement, whether to settle a case, whether to testify at trial, and whether to waive a jury trial. *See* Utah R. Prof. Conduct 1.2(a). The attorney also is obligated to keep his client informed. *See id.;* Utah R. Prof. Conduct 1.4. Yet, notwithstanding these professional requirements, an attorney still retains responsibility for tactical decisions regarding a case, including deciding which motions to pursue or not pursue. The official comment to Rule 1.2, on the scope of representation, states, with our emphasis: "[A] lawyer is not required to pursue objectives or employ means simply because a client may wish that the lawyer do so.... In questions of means, the lawyer should assume responsibility for technical and *legal tactical issues* [.]" Deciding whether to file a motion to suppress eyewitness identifications before trial or to wait and discredit the eyewitnesses' testimony during cross-examination, following up with a *Long* instruction, is one such tactical matter.

¶ 25 If Mecham was so opposed to the tactic formulated by his counsel, he had other avenues of redress. *See* Utah R. Prof. Conduct 1.16(a)(3) ("A lawyer shall not represent a client ... if: The lawyer is discharged."); *id.* at 1.16(b)(3) ("A lawyer may withdraw from representing a client ... if: A client insists upon pursing an objective that the lawyer considers ... imprudent[.]"). Mecham could have sought new counsel or continued to press his wish for a *Ramirez* hearing regarding the eyewitness identifications. While Mecham may have favored seeking pretrial suppression of the testimony, the record shows that Mecham was informed about the tactics his counsel was pursuing throughout, never again requested that counsel follow a different approach, got along rather well with his counsel, and never—until this appeal—fussed about the quality of his counsel's representation.

¶ 26 Accordingly, trial counsel's decision not to seek pretrial *Ramirez* relief was a product of sound tactics rather than of ignorance or ineptitude. Mecham's ineffective assistance claim fails on this basis, and we have no need to consider whether it also fails on the second ground, i.e., that he has not shown that prejudice resulted from his counsel's actions.[6] *See Marvin,* 964 P.2d at 315.

---

5. As defendant's counsel described it, "for the most part these witnesses, the ones who testified, were 18 and 19 year old girls; had never been in court before. We didn't want them to have any more experience than possible before taking the stand in front of the Jury." At trial, one of the witnesses testified that Mecham's eyes were blue, when his eyes were actually brown. Mecham's counsel described during his 23B testimony how parading Mecham up to this witness for her to identify his actual eye color "worked good."

6. In dispensing with any analysis of the prejudice prong, we do not mean to suggest Mecham's prejudice argument is well-taken. From the facts set out in this opinion, it should be apparent the result would be the same no matter which of the two prongs of the *Strickland* test we considered.

## B. Merger

¶ 27 Mecham also argues that under the facts of this case, aggravated kidnaping should be merged as a lesser included offense of aggravated robbery and that the trial court erred in holding otherwise. According to Mecham, the detention of the employees during the robbery was part and parcel of the robbery. We agree that some detention is inherent in the "host crime" of aggravated robbery. But this does not automatically merge the two crimes each time they occur as part of the same criminal episode.

¶ 28 Utah Code Ann. § 76–1–402 (1999) defines a lesser included offense:

(3) A defendant may be convicted of an offense included in the offense charged but may not be convicted of both the offense charged and the included offense. An offense is so included when:

(a) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged....

"Included offenses are defined as those ' "where the two crimes are 'such that the greater cannot be committed without necessarily having committed the lesser.' " ' " *State v. Finlayson*, 956 P.2d 283, 287 (Utah Ct.App.1998) (quoting *State v. Shaffer*, 725 P.2d 1301, 1313 (Utah 1986)) (other citations omitted). "If the jury is not required to find any additional elements to convict a defendant of the lesser crime once it has found him guilty of the greater, then the lesser crime is mere surplusage." *Id.*

¶ 29 The Utah Supreme Court has made it abundantly clear, however, that section 76–1–402 never applies to merge crimes that have distinct statutory elements.

[W]hether one crime is a lesser included offense of a greater crime under section 76–1–402, turns on the statutorily defined elements of the two crimes. That is, the court looks to the facts to determine what crime, or variation of the crime, was proved, but once this determination is made, the court looks to the statutory elements of the crime to determine whether it is an included offense.

*State v. Finlayson*, 2000 UT 10, ¶ 16, 994 P.2d 1243. Simply put, the focus of section 76–1–402 is on the statutory elements required. *See id.* The definitions of aggravated kidnaping[7] and aggravated robbery[8] contain different elements. Specifically, there is no detention element stated in the definition of aggravated robbery. *See* Utah Code Ann. § 76–6–302 (1999). Accordingly, because the two crimes have distinct statutory elements, aggravated kidnaping is not a lesser included offense of aggravated robbery. *See Finlayson*, 2000 UT 10 at ¶ 16, 994 P.2d 1243. Yet it is a matter of common sense that detention, while not an element, is inherent in most aggravated robberies.[9]

7. Utah Code Ann. § 76–5–302 (1999) states:

(1) A person commits aggravated kidnaping if the person intentionally or knowingly, without authority of law and against the will of the victim, by any means and in any manner, seizes, confines, detains, or transports the victim:

(a) and in committing, attempting to commit, or in the immediate flight after the attempt or commission of the kidnaping, the actor possesses, uses, or threatens to use a dangerous weapon as defined in Section 76–1–601; or

(b) with intent:

...

(ii) to facilitate the commission, attempted commission, or flight after commission or attempted commission of a felony....

8. Utah Code Ann. § 76–6–301 (1999) states:

(1) A person commits robbery if:

(a) the person unlawfully and intentionally takes or attempts to take personal property in the possession of another from his person, or immediate presence, against his will, by means of force or fear; or

(b) the person intentionally or knowingly uses force or fear of immediate force against another in the course of committing a theft.

Utah Code Ann. § 76–6–302 (1999) states:

(1) A person commits aggravated robbery if in the course of committing robbery, he:

(a) uses or threatens to use a dangerous weapon as defined in Section 76–1–601;

(b) causes serious bodily injury upon another; or

(c) takes an operable motor vehicle.

9. An instance of aggravated robbery without some detention would be unusual, but could happen, as in the case of a perpetrator clubbing an unsuspecting victim over the head and snatching her purse just as she fell to the ground.

■ ¶ 30 Indeed, there is another conceptually distinct basis for finding that "one set of facts may give rise to a merger of two or more separate crimes," despite each crime's unique statutory elements, "so as to preclude multiple convictions for essentially the same conduct." *Id.* at ¶ 17. In *State v. Couch*, 635 P.2d 89 (Utah 1981), the Utah Supreme Court recognized that "[a] defendant convicted of both kidnaping and what can be termed the 'host crime' would in many cases receive a significantly heavier sentence than if only the host crime had been charged." *Id.* at 92. Therefore, to convict a robber of aggravated kidnaping as well as aggravated robbery, consistently with *Couch*, the prosecutor must first show that the detention was beyond "the minimum inherent in [aggravated robbery]." *Id.* at 93. Moreover, the detention element must be "significantly independent" of the detention inherent in the host crime. *Finlayson*, 2000 UT 10 at ¶ 23, 994 P.2d 1243.

¶ 31 The aggravated robbery in this case, and almost every aggravated robbery as a factual matter, contains the elements needed to prove aggravated kidnaping.[10] But under *Couch*, the question is whether there exists a sufficiently independent basis for the separate charge of aggravated kidnaping. *See* 635 P.2d at 92–93.

■ ¶ 32 In *Finlayson*, the Utah Supreme Court recognized the usefulness of a three-part test for determining whether the *Couch* rule is satisfied—i.e., whether a detention or movement of a victim is sufficiently independent to justify a separate conviction for aggravated kidnaping. *See* 2000 UT 10 at ¶ 23, 994 P.2d 1243. The three-part test states:

> "[I]f a taking or confinement is alleged to have been done to facilitate the commission of another crime, to be kidnaping the resulting movement or confinement:

> (a) Must not be slight, inconsequential and merely incidental to the other crime;

> (b) Must not be of the kind inherent in the nature of the other crime; and

> (c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection."

*Id.* (quoting *State v. Buggs*, 219 Kan. 203, 547 P.2d 720, 731 (1976)).

¶ 33 Applying this three-part test to the facts of this case, the evidence shows that the detention was not slight or inconsequential. All seven employees were bound, and the trial court noted that it was unclear how long they would remain so before they were discovered or able to free themselves. This was not a typical robbery where the victims' detention consists of them simply standing still for a few brief moments, with their hands up. Second, binding victims and confining them to a room is not inherent in an aggravated robbery. It is an additional act, completely independent of the act of taking property by force or threat of force. Lastly, the detention did make the crime substantially easier to commit, and was done expressly for the purpose of avoiding premature detection. Under these facts, we conclude that the trial court was correct in recognizing that herding the victims at gunpoint to the manager's office and binding their hands behind their backs had sufficient independence to support a charge of aggravated kidnaping.[11]

¶ 34 Based on the law and the facts of this case, we reject Mecham's argument that aggravated kidnaping is a lesser included offense of aggravated robbery under Utah Code Ann. § 76–1–402 (1999), as well as his

---

**10.** This is in part because there is no "substantial period" requirement in Utah's aggravated kidnaping statute, unlike Utah's simple kidnaping statute. *See* Utah Code Ann. § 76–5–301(1)(a) (1999).

**11.** This conclusion has support in the examples given by the Kansas Supreme Court in the case relied on in *Finlayson:*

> A standstill robbery on the street is not a kidnaping; the forced removal of the victim to a dark alley for robbery is. The removal of a rape victim from room to room within a dwelling solely for the convenience and comfort of the rapist is not a kidnaping; the removal from a public place to a place of seclusion is. *The forced direction of a store clerk to cross the store to open a cash register is not a kidnaping; locking him in a cooler to facilitate escape is.*

*Buggs,* 547 P.2d at 731 (emphasis added).

argument that the two crimes should be viewed as merged under the *Couch* doctrine.

## CONCLUSION

¶ 35 We conclude Mecham was not denied effective assistance of counsel because there were conceivable—indeed, articulated—tactical bases for counsel's decision not to move to suppress the eyewitness identification of Mecham. We also conclude aggravated kidnaping and aggravated robbery do not merge under the facts of this case. The detention to which the employees of the Cinemark 10 were subjected exceeded the restraint inherent in a typical aggravated robbery and was sufficiently independent to support an aggravated kidnaping conviction.

¶ 36 Affirmed.

¶ 37 WE CONCUR: RUSSELL W. BENCH, Judge, and JAMES Z. DAVIS, Judge.