**STATE of Utah, Plaintiff and Appellee,**

v.

**Craig FISHER, Defendant and Appellant.**

**No. 971137–CA**

Court of Appeals of Utah.

Dec. 24, 1998.

E. Kent Winward, Ogden, for Appellant.

Jan Graham, J. Frederic Voros Jr., Robert N. Parrish; and Craig L. Barlow, Salt Lake City, for Appellee.

Before DAVIS, P.J., and BENCH and JACKSON, JJ.

## OPINION

JACKSON, Judge:

Defendant Craig Fisher appeals his conviction of abuse or neglect of a disabled child, a third degree felony, in violation of Utah Code Ann. § 76–5–110 (Supp.1998). Fisher argues that the evidence at trial was insufficient to support a finding that he was a "caretaker" of a "disabled child," as those terms are used in section 76–5–110, and that section 76–5–110 is unconstitutionally vague. He further argues that, under *State v. Shondel*, 22 Utah 2d 343, 453 P.2d 146 (Utah 1969), the charges against him should be reduced to misde-

meanor child abuse. Finally, Fisher argues that his right to a unanimous jury verdict was violated. We affirm.

## BACKGROUND

Fisher was a nineteen-year-old counselor for Northstar, a wilderness program for troubled youth, in 1994. The Northstar program had four sections: "A-team," which was an orientation/holding area for youth entering the program; "Primitive," in which the children were taken out into the Escalante River basin with backpacks, sleeping bags, and modest amounts of food; "Handcarts," in which the students learned to work together as a team; and "Llamas," the final section of the program, in which the students learned to care for animals and also prepared to return to their homes.

Fisher was assigned as a staff member, along with Sonny Duncan and Jeff Hohenstein,[1] to lead a group on the Primitive section of Northstar in March 1994. Duncan was the "head instructor." Fisher had about three months experience, which was more than the other two instructors. The Primitive section began with a two-day fast called "Impact." This forty-eight-hour fast was the maximum allowed by state regulations. After Impact, each student was given a can of peaches to break the fast, and then they received a one-week supply of food. Each week, the group would meet with other Northstar employees to pick up the next week's food supply.

Northstar policy provided that the students were not told how to ration their week's supply of food; rather, they were allowed to eat as much as they wished each day. Each food package generally consisted of rice, lentils, oatmeal, cornmeal, trail mix, and smaller amounts of fresh vegetables, cheese, and sausage. The students were required to cook their food themselves in a metal cup (holding about five fluid ounces) provided by Northstar. The three instructors could have other food, but they were not allowed to share with the students. Each

instructor was also given one twenty-four-hour leave each week.

At the beginning of the program, each student was assigned a backpack, sleeping bag (rated to twenty degrees below zero), and clothing.[2] The students were not allowed to wear a watch or carry a compass, and were unaware of their location except to know that they were a long way from the nearest town. To make any attempt to run away more difficult, the instructors kept the group away from roads.

The students had to keep a daily journal in which they recorded their progress through the program. Each student's journal was read by an instructor, who also wrote comments to the student in the student's journal. The instructors also had to keep journals.

The students were instructed in various wilderness skills, such as identifying edible plants and learning to start a fire using a "bow drill." The general rule was that a student could not "use the fire"—that is, sit by the fire in the evenings—until he or she had succeeded in starting a fire with the bow drill. Most nights the group slept under a shelter of tarpaulins.

The practice in the Primitive phase of the Northstar program was for the students and staff to eat only two meals a day—breakfast and dinner. However, students were allowed to eat their weekly food allotment at whatever pace they chose, and they were not prohibited from eating a mid-day meal if they wished. No one was allowed to share food with anyone else.

Most days, an instructor was in radio contact with Northstar's Escalante office. The instructors were expected to report any illness, complaint, or disciplinary incident (such as a student refusing to carry his or her pack or trying to run away) to their backup supervisor.

Upon being employed by Northstar, each instructor reviewed and signed a copy of the Northstar policies and procedures, which were consistent with state licensing stan-

---

1. Duncan and Hohenstein each pleaded guilty to negligent homicide regarding this matter.

2. Each student was given a hooded sweatshirt, three shirts, three pairs of cotton pants, socks, boots, underwear, a cap, some handkerchiefs, lip balm, and a water bottle.

dards. The policies provided that "line staff" (the instructors) were responsible "for the safety and welfare of fellow staff members and students."

One section of the policies detailed the duties of staff members, and also outlined actions forbidden by Northstar. In particular, the policies instructed staff never to "call students names or make jokes directed toward any individual that could be interpreted as emotional abuse," and never to "make comments that are condeming [sic] of the students." Each staff member—including Fisher—was also required to review and sign a copy of the Provider Code of Conduct. Fisher initialed each line of the pages entitled "Discipline and Treatment of the Student," which provided that

The following is not appropriate treatment of a student and is grounds for dismissal:

. . . .

2. Verbal abuse using language which attacks the well being of the student. This may include but is not limited to name calling, teasing, humiliation, ridicule, use of foul and abusive language, etc.

3. The withholding of any meal.

4. Excessive denial of ongoing program services or denial of any essential program services solely for disciplinary purposes.

. . . .

8. Denial of shelter, clothing or bedding.

. . . .

11. Failure to provide adequate medical care and/or treatment as is necessary or as is instructed by a physician.

Sixteen-year-old Aaron Bacon was enrolled in Northstar on February 28, 1994, by his parents. Bacon had been removed from his Phoenix home early that morning—with no warning to him, but with his parents' consent—and escorted by Northstar employees to Escalante, Utah. When Bacon entered the program, he was five feet, ten inches tall and weighed 131 pounds. Bacon was assigned to Fisher's Primitive section on March 11, and in accord with Northstar practice, ate no food on March 12–13 (the "Impact" portion) except some prickly pear cactus he foraged. On March 12, Bacon noted in his journal that he fell twice while hiking and

could not get up because the pack was too heavy. . . . I fell because I lost balance and my legs were so weak. . . . My whole body became numb that time and I was so weak that I couldn't even lift my arms. I was down for so long that I began to lose sight. Not go blind but I couldn't keep my eyes open.

The instructors often heard complaints of various ailments from students, and believed that most times, students feigned complaints in an attempt to be taken out of the program. The instructors testified that they believed Bacon, too, was feigning his problems and fell because he was lazy and did not want to carry a pack.

On March 13, to break the Impact fast, Bacon and the others each ate a can of peaches. That night Bacon ate rice and lentils for dinner. The next day, March 14, he ate both breakfast and dinner. Bacon also fell while hiking on this day. He did not eat breakfast on the morning of March 15. He stopped hiking and lay down, complaining that he was too tired to hike and could not go any further. Again, Fisher and the other instructors interpreted Bacon's complaints as "a lack of motivation and laziness." Bacon and another student decided to drop their packs—that is, continue hiking with the group but without their packs—and they were told by Fisher and the other instructors that if they dropped their packs, it would be several days before they could retrieve them. Bacon and the other student decided nonetheless to drop their packs, leaving behind their food, sleeping bags, and cooking cups. As a result, Bacon was not able to cook food that evening (although he ate some cold food). Bacon was also without his sleeping bag and coat that night, and slept under the shelter with the group. The low temperature that night was thirty-one degrees Fahrenheit.

Bacon had less difficulty hiking the next day, March 16, although he and another student slid down a slickrock wall, breaking a couple of water containers and suffering a few minor abrasions. Fisher interpreted Bacon's ability to hike well that day as proof of Bacon's laziness on the previous days. None

of the students ate dinner that night, because they did not have enough water. The low temperature was thirty-six degrees Fahrenheit, and Bacon again slept without a sleeping bag.

On March 17, the only breakfast Bacon ate was a six-inch-long raw lizard and one cooked scorpion (several other students and staff members also ate scorpions). The group returned to the dropped packs that day, and Bacon was able to eat a hot dinner. Bacon ate two meals on March 18. That day, the entire group waded through chest-deep water, and Bacon's pack and its contents, including his clothes and sleeping bag, were soaked through. The low temperature that night was thirty-six degrees Fahrenheit.

None of the students ate breakfast on March 19, but they did eat rice and lentils for dinner. The group did not hike on March 20. When Bacon and another student were still not able to make a fire using the bow drill, Fisher established a "no fire, no food" rule, and the other instructors acquiesced in his decision. The next day, March 21, Bacon wrote in his journal that "I haven't been able to eat for awhile and I'm pretty cold and hungry. I haven't eaten for a long time. Actually for more than a day." He also wrote that

> I am in terrible condition here. My hands are all chapped and my lips are cracking. I feel like I'm losing control of my body. I start[ed] to pee my pants every night for the past three nights and today when we started our little hike I took a dump in my pants. I didn't even feel it coming. It just happened. I told Jeff [Hohenstein] because I thought he might be more sympathetic and easy on ... me, but he yelled to Craig [Fisher], "He took a dump in his pants." ... All of the other students started to laugh and I couldn't help it.

Again, Fisher and the other instructors interpreted Bacon's incontinence as a sign that Bacon lacked "self-respect" and was feigning ailments. Although the group often slept in a "burrito"—with everyone sleeping close together under the same tarp—after this date no one would sleep next to Bacon.

It is not clear whether Bacon ate dinner that night, but he never succeeded in starting a fire using the bow drill and would thus have been prohibited from eating anything but cold or foraged food under Fisher's "no fire, no food" rule. Fisher left for his twenty-four-hour leave on the evening of March 21.

Bacon was not allowed to eat breakfast on the morning of March 22 because "his cup wasn't clean" and he "didn't get a fire," but he did forage some prickly pear cactus. Because Fisher was in town on leave, he did not participate in this decision. Fisher returned from leave on the evening of March 22 and was angry at the students because they were late setting up camp. As a result, the students were not allowed to eat dinner, although the staff ate a dinner of bacon and pork chops. That evening, Bacon wrote in his journal that "[a]ll I can think about is cold and pain.... I need to eat now. I haven't been able to eat trail food all day, no breakfast, no trail food, nothing. I am so cold."[3]

On March 23, Bacon's cup was still not clean, so he was not allowed to cook food. The other students ate rice and lentils. Bacon again told the instructors that he could not carry his pack any longer and that his stomach hurt. Fisher reminded Bacon that if he dropped his pack he would not have food or a sleeping bag for the next few days, but Bacon dropped his pack anyway. Bacon's only dinner that night was a mixture of powdered milk and brown sugar given to him secretly by another student. That night, he slept under the shelter, without a sleeping bag, blanket, or coat. The low temperature that night was twenty-five degrees Fahrenheit.

Bacon was not allowed to eat breakfast or dinner on March 24, and he again slept without a sleeping bag or blanket. The low temperature that night was twenty-nine degrees Fahrenheit, and Bacon told the instructors that he was cold. The next morning, March 25, Bacon had only prickly pear cactus or pine needle tea for breakfast. The group hiked eight miles that day. The in-

---

3. Bacon did not write in his journal after this   day.

structors "were a little bit concerned about [Bacon's] energy level" and "his appearance. He was getting a bit thin at that point [and] was weak, his face was pale and his cheeks were hollow" and he was "looking gaunt." Bacon was not allowed to eat that night, again complained of a stomach ache, and was listless and dispirited.

The owners of Northstar, Bill Henry and Lance Jaggar,[4] visited the group's camp that night. They gave Bacon a wool blanket to sleep with, but they directed the instructors not to let Bacon sleep under the shelter because he had not helped build it. Bacon slept near the fire. The low temperature that night was twenty-seven degrees Fahrenheit.

Bacon ate prickly pear cactus and pine needle tea for breakfast the next morning, March 26. On Henry and Jaggar's direction, the instructors made the students do "physical training"—100 four-count jumping jacks, 100 leg raises, 100 sit-ups, and 50 pushups. Bacon was able to do only ten sit-ups on his own power, and the instructors helped him do another twenty more. The group hiked only two miles that day, because Bacon said he could not hike any longer. That night, Fisher and another instructor took rice and lentils from another student and gave them to Bacon to eat. Later that night, he again complained of stomach pain and vomited. The low temperature was twenty-eight degrees Fahrenheit.

Fisher left for his second twenty-four-hour leave late on the night of March 26. He called Henry and asked for Bacon to be transferred to the "A-team" section of Northstar because Bacon was poorly motivated and had a bad attitude. Also on March 26, Jeff Hohenstein filled out a weekly evaluation for Bacon. He wrote that Bacon's health was "[n]ot good. Since he dropped his pack he has lost more weight. He is listless . . . ." Hohenstein described Bacon's motivation as "[n]on-existent: even in the face of the strictest consequences he practically, almost literally, has to be picked up and made to move."

On March 27, Bacon was allowed to eat rice and lentils for breakfast and dinner, in spite of the "no fire, no food" rule. The group hiked more than ten miles that day. When Fisher returned from his twenty-four-hour leave, he brought an electrolyte replacement drink for Bacon and another student. Although he still had not made a fire, Bacon was allowed to eat that night, because Fisher and Hohenstein were concerned about him. The low temperature was thirty-two degrees Fahrenheit.

The "no fire, no food" rule was invoked again by the three instructors on March 28, and Bacon was not allowed to eat breakfast. They hiked between eight and fifteen miles that day. By this time, Bacon looked skinny and unhealthy, his face was drawn, and he could not hike well. Bacon had to be carried the last half-mile into camp that night, and was "always complaining" that his stomach hurt. Again, the instructors discounted Bacon's complaints and called him a "faker."

At this point, the instructors were concerned about Bacon's weight loss and told him he had to eat. The instructors made him eat a cup of rice and lentils, and Bacon complained that it hurt him to eat. Bacon told the instructors that his stomach hurt and he needed to see a doctor, but they told him it was a long way to a doctor. The low temperature that night was thirty-two degrees Fahrenheit.

The group did "full-body hygiene" on March 29—that is, they all stripped down, washed their bodies, and laundered their clothes. Bacon's fellow students testified that he was pale and "really skinny" and looked like a "Jewish person" in a "concentration camp." Bacon again asked that day, in Fisher's presence, to see a doctor. He again complained that his stomach hurt and that he was dizzy, and he also reported seeing spots. Bacon hiked poorly that day, and repeatedly fell down. When Fisher asked Bacon why he was "falling all the time," Bacon responded that he did not know. Bacon's "very general and vague" answers led Fisher to conclude that "it was something minor being exaggerated or an outright fake."

---

4. Henry and Jaggar pleaded guilty to negligent homicide and operating a human services program in violation of licensing standards in connection with Bacon's death.

That evening, Bacon had difficulty gathering wood. The instructors, including Fisher, mocked Bacon by saying "I'm to [sic] week [sic] to pick up wood. I'm weak. My stomach hurts. I can't eat." Bacon ate rice and lentils that night. The low temperature was thirty-two degrees Fahrenheit.

Bacon ate oatmeal for breakfast on March 30. He retrieved his pack after the group had hiked a mile or two. However, he decided to abandon it again after he fell over while carrying it. Bacon was carried back to camp by other students, and on the way there Bacon looked up at the sky and said that it "looked purple and that there was lights flashing." Bacon again complained of stomach pain. Fisher wrote in his journal that the group "tried to hike, but [Bacon] wouldn't allow us to," and that Bacon was "throwing fits and moaning." Fisher radioed the Northstar office, and Georgette Costigan,[5] an emergency medical technician, met the group to check on Bacon.

Costigan asked Bacon how he was doing and gave him a piece of cheese. She did not do a medical assessment beyond noticing that his skin was flushed and dry and feeling for (but not counting) his pulse. Bacon told Costigan that his stomach hurt. Neither Fisher nor the other instructors told Costigan that Bacon had been complaining of stomach pain; he had gone without food or a sleeping bag; he complained of dizziness and seeing spots and other visual hallucinations; he had repeatedly fallen while hiking; he was incontinent; he had vomited; he had repeatedly asked to see a doctor; or that he had been losing weight. When Fisher asked Costigan to take Bacon back into town with her, Costigan said that because it was not anything serious, she would leave him there for the night and come back to check on him again the next day.

Bacon vomited again that night. He was moaning, and when Fisher told him to stop moaning, Bacon said that he could not. While the other students ate dinner and wrote in their journals, Bacon sat away from the group, his head tilted to the side and his jaw agape, drooling. Fisher told him to stop drooling and mimicked him. Bacon ate rice and lentils that night, and complained that his stomach was hurting "really bad." He told Fisher that he did not want to die, and Fisher assured him that he would not. Bacon slept in a sleeping bag that night for the first time in eight days.

On the morning of March 31, Bacon took about one hour to leave the shelter and crawl to the campfire, which was twenty feet away. Fisher testified that Bacon looked "really bad.... He looked really sick and he was— he was weak. We had to ... pick him up off the ground." Bacon repeatedly fell asleep while he was crawling, and Fisher and the other instructors would wake him up and tell him to keep going. He had again become incontinent. When Bacon was finally able to stand up, he immediately fell over again. Bacon told Fisher and Hohenstein that he had to use the latrine, and when they went to check on him they found that Bacon could not make it to the latrine. They carried him to the latrine and left him there; when they returned for him, they found that he had fallen into the latrine and his feet were covered in excrement.

Another instructor radioed the Northstar office to tell them that Bacon refused to hike and was complaining of a stomach ache. Costigan told the instructor to leave Bacon with the Llama group, which she would be visiting that day. Students carried Bacon to the Llama camp. Some time later, other Northstar employees arrived to take Bacon from the Llama group to the A-team (holding group). Bacon was unable to walk and looked pale and sickly, and he told one of these staff members that he was "really sick." A Northstar employee, who had been told that Bacon was feigning illness, told Bacon that he just needed to get in the truck. Bacon got into the truck and the Northstar employee fastened Bacon's seat belt.

For the next few minutes, the staff made fun of Bacon and imitated his collapse. When Bacon slouched over in the truck, they unbelted him, checked for a pulse, began CPR, and radioed Northstar for help. A physician's assistant, who had examined Bacon before he began the Northstar program,

5. Costigan pleaded guilty to negligent homicide regarding Bacon's death.

arrived and began advanced life support procedures on Bacon. The physician's assistant later testified that Bacon was so gaunt he did not recognize Bacon as the boy he had examined several weeks earlier. A helicopter arrived, and Bacon was flown to Page, Arizona, where he was pronounced dead.

The autopsy revealed that Bacon died of acute peritonitis resulting from a perforated ulcer. Expert testimony established that the ulcer had most likely developed around March 15, and that malnutrition and hypothermia would have aggravated his condition. During his time at Northstar, Bacon's weight dropped from 131 pounds to 108 pounds, a 17% loss of body mass.

## DISCUSSION

### I. Sufficiency of the Evidence

Fisher first argues that the evidence presented at trial was insufficient to show that Bacon was a "disabled child" and Fisher was his "caretaker," as those terms are used in Utah Code Ann. §§ 76–5–110(1)(b)–(1)(c) (Supp.1998).

> When examining the sufficiency of the evidence in a criminal jury trial, we begin with the threshold issue of statutory interpretation, which we decide as a matter of law. With regard to the facts, "we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury." Under this standard, we will reverse a conviction only when the evidence, viewed in light of our interpretation of the statute, "is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he [or she] was convicted."

*State v. Gibson,* 908 P.2d 352, 355 (Utah Ct.App.1995) (alteration in original) (citations omitted).

■ When faced with an issue of statutory construction, we first examine the statute's plain language. *See State v. Rudolph,* 970 P.2d 1221, 1228 (Utah 1998). Section 76–5–110 provides that "[a]ny caretaker who abuses or neglects a disabled child is guilty of a third degree felony." Utah Code Ann. § 76–5–110(2) (Supp.1998). The statute defines a "disabled child" as "any person under 18 years of age who is impaired because of ... physical illness ... or other cause, to the extent that he is unable to care for his own personal safety or to provide necessities such as food, shelter, clothing, and medical care." *Id.* § 76–5–110(1)(c). A "caretaker" is defined as "any parent, legal guardian, or other person having under his care and custody a disabled child; or any person [who] has assumed by contract or court order the responsibility to provide food, shelter, clothing, medical, and other necessities to a disabled child." *Id.* § 76–5–110(1)(b)(i) & (ii).

### A. Disabled Child

The State contends Bacon was a disabled child because he was "impaired because of [some] other cause." In particular, the State argues that because Bacon was unable to provide his own food, clothing, and shelter, and because food and shelter were withheld from him, Northstar is an "other cause" under the statute. In that sense, Bacon was a "disabled child" from the moment he began the Primitive section of Northstar. The State also argues that Bacon was disabled because his ulcer disease (and resulting peritonitis), coupled with malnutrition and exposure to cold, was a physical illness within the meaning of the statute. In this respect, it is impossible to say when, exactly, during the Primitive section Bacon became a disabled child.

■ Fisher argues, in effect, that interpreting the statute this way would not comport with the legislative intent behind the statute, and that this definition of "disabled" could apply to *any* child. He argues specifically that Bacon's ulcer disease did not render him physically disabled until, at most, the last forty-eight hours of his life. Fisher argues further that, under the doctrine of *ejusdem generis,*[6] Bacon's participation in the

---

6. Under the doctrine of *ejusdem generis* ("of the same kind"), "general terms in a statute should 'be given a meaning that is restricted to a sense analogous to the [more] specific terms.' " *Field*

Northstar program cannot be considered an "other cause" of Bacon's disability.

■ However, we need not apply the doctrine of *ejusdem generis* because we conclude that, under the statute's plain language, Bacon was a disabled child. *See Freund v. Utah Power & Light Co.*, 793 P.2d 362, 367 (Utah 1990) (stating that "the *ejusdem generis* rule does not apply in the absence of ambiguity"). At some time after his ulcer developed—and certainly after he developed the peritonitis that killed him—Bacon was unable to provide his own food, clothing, and shelter as a result of "physical illness." Utah Code Ann. § 76–5–110(1)(c) (Supp.1998). Thus, we hold that under section 76–5–110's plain language, Bacon was a disabled child.

### B. Caretaker

Fisher argues that he was not Bacon's "caretaker" because, under the doctrine of *ejusdem generis*, "the common trait contained in all the other types of caretakers in the statute is legal obligation." We disagree. First, *ejusdem generis* does not apply when the language of the statute is unambiguous, as is the case with section 76–5–110. *See Freund v. Utah Power & Light Co.*, 793 P.2d 362, 367 (Utah 1990). Second, the definition clearly applies to Fisher. Fisher admitted that he was responsible for Bacon's physical well-being while Bacon was in the Primitive section of the Northstar program. Thus, Fisher was an "other person having under his care and custody" a disabled child.

■ Given our interpretation of section 76–5–110's plain language, and viewing the evidence presented at trial in a light most favorable to the jury's verdict, we cannot say that the evidence " 'is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that [Fisher] committed the crime of which he ... was convicted.' " *State v. Gibson*, 908 P.2d 352, 355 (Utah Ct.App.1995) (quoting *State v. Johnson*, 821 P.2d 1150, 1156 (Utah 1992)).

v. Boyer Co., L.C., 952 P.2d 1078, 1087 (Utah 1998) (alteration in original) (quoting Nephi City

## II. Constitutionality of Section 76–5–110

■ Fisher makes the bald assertion that section 76–5–110 is unconstitutionally vague, but does not analyze the issue and makes only a tangential cite to one case. Because Fisher failed to brief this argument adequately as required by Rule 24(a)(9) of the Utah Rules of Appellate Procedure, we decline to address it. *See State v. Thomas*, 961 P.2d 299, 305 (Utah 1998) (stating that Rule 24(a)(9) "requires not just bald citation to authority but development of that authority and reasoned analysis based on that authority").

### III. *Shondel* Issues

Fisher argues that, because Bacon was not a disabled child, the elements the State was required to prove under section 76–5–110 are identical to the elements of misdemeanor child abuse, Utah Code Ann. § 76–6–109(3) (Supp.1998). If Fisher's assertion were accurate, *State v. Shondel*, 22 Utah 2d 343, 453 P.2d 146 (Utah 1969), would require reducing Fisher's conviction to misdemeanor child abuse.

■ Our "review under the *Shondel* rule 'focuses on the trial court's legal conclusions, which we review under a correction-of-error standard, according no particular deference to the trial court's ruling.' " *State v. Kent*, 945 P.2d 145, 146 (Utah Ct.App.1997) (quoting *State v. Vogt*, 824 P.2d 455, 456 (Utah Ct.App.1991)). The *Shondel* rule provides that "where there is doubt or uncertainty as to which of two punishments is applicable to an offense[,] an accused is entitled to the benefit of the lesser." *Shondel*, 453 P.2d at 148. Our inquiry focuses on " 'whether the ... statutes at issue proscribe *exactly* the same conduct, i.e., do they contain the *same elements?* ' " *Kent*, 945 P.2d at 147 (quoting *State v. Gomez*, 722 P.2d 747, 749 (Utah 1986)). If the statutes do not require proof of the same elements, the defendant may be charged under the statute carrying the more severe sentence. *See id.*

v. Hansen, 779 P.2d 673, 675 (Utah 1989)).

■ We agree with the State that the *Shondel* rule does not apply to this case. The two statutes in question do not require proof of the same elements.[7] The statute under which the State charged Fisher requires proof of four elements: (1) that a caretaker (2) abuses or neglects (3) a disabled (4) child. *See* Utah Code Ann. § 76–5–110(2) (Supp.1998). In contrast, the elements of misdemeanor child abuse are (1) that a person inflicts or, "having the care or custody of [a] child, causes or permits another to inflict" (2) physical injury (3) upon a child, with (4) either intentional, reckless, or negligent mens rea. *See* Utah Code Ann. § 76–5–109(3) (Supp.1998).

The abuse of a disabled child statute requires proof of elements not required by the misdemeanor child abuse statute: most significantly, the "disabled child" element. Thus, the statutes are not "wholly duplicative as to the elements of the crime," *State v. Bryan*, 709 P.2d 257, 263 (Utah 1985), and therefore the *Shondel* doctrine does not apply to this case.

### IV. Jury Unanimity

Fisher argues that the jury unanimity rule was violated because the jury was asked whether he abused Bacon between March 11 and March 31, and the jury might have considered conduct occurring during Impact or during the forty-eight hours when Fisher was on leave. The crux of Fisher's argument is that the State argued "several theories" that were legally insufficient and that we cannot know whether the jury based its verdict on one of these "theories."

■ " '[T]he propriety of a jury instruction presents a question of law' " which we review for correctness. *State v. Carlson*, 934 P.2d 657, 659 (Utah Ct.App.1997) (quoting *State v. Brooks*, 833 P.2d 362, 363 (Utah Ct.App. 1992)).

The jury unanimity rule provides that "in a criminal case ... a jury must be unanimous on all *elements* of a criminal charge for the conviction to stand." *State v. Johnson*, 821

P.2d 1150, 1159 (Utah 1991) (emphasis added); *see* Utah Const. art. I, § 10 ("In criminal cases the verdict shall be unanimous."). However,

> a defendant is not entitled to a unanimous verdict on the precise manner in which the crime was committed, or by which of several alternative methods or modes, or under which interpretation of the evidence so long as there is substantial evidence to support each of the methods, modes, or manners charged.

*State v. Russell*, 733 P.2d 162, 165 (Utah 1987).

In this case, Fisher argues that (1) the forty-eight-hour Impact period, (2) the forty-eight hours when Fisher was on leave, and (3) the last forty-eight hours of Bacon's life, when he was given food and rudimentary medical attention, were "theories" of liability argued by the State, and that the jury might have based its verdict on one of these "theories."

■ We agree with the State that Fisher's argument confuses days with theories. The State alleged only one theory of the case: that Fisher's actions over a twenty-day period cumulatively constituted abuse or neglect of a disabled child. After a verdict was returned, the jury was polled and each juror affirmed that he or she found Fisher guilty of the offense charged—that is, of the elements of abuse or neglect of a disabled child. Our cases do not require jury unanimity on the factual question of which days within the period Fisher did, and which days he did not, commit acts contributing to the abuse or neglect of a disabled child. Hence, Fisher's right to a unanimous jury verdict was not violated.

### CONCLUSION

The evidence at trial was sufficient to show that Fisher was a caretaker of a disabled child, as those terms are used in section 76–

---

7. Our criminal code defines an "element of the offense" as "[t]he conduct, attendant circumstances, or results of conduct proscribed, prohib-

ited, or forbidden in the definition of the offense; [and t]he culpable mental state required." Utah Code Ann. § 76–1–501 (1995).

5-110. We do not reach the issue of section 76–5–110's constitutionality because that issue was inadequately briefed. Further, because section 76–5–110 requires proof of an element—that the victim be a disabled child—not required by section 76–5–109 (misdemeanor child abuse), the *Shondel* doctrine is not implicated in this case. Finally, the jury unanimity rule was not violated when the jury was instructed to consider whether Fisher abused or neglected Bacon during the period of March 11 to March 31.

Accordingly, we affirm Fisher's conviction.

JAMES Z. DAVIS, Presiding Judge, and RUSSELL W. BENCH, Judge, concur.