2000 Utah Ct. App. 185

STATE of Utah, Plaintiff and Appellee,

v.

Travis D. WIDDISON, Defendant and Appellant.

No. 981401–CA.

Court of Appeals of Utah.

June 15, 2000.

---

Donald E. McCandless and Thomas J. Scribner, Fisher Scribner Moody & Stirland, Provo, for Appellant.

Jan Graham, Attorney General, Laura B. Dupaix, and Robert Parrish, Assistant Attorneys General, Salt Lake City, for Appellee.

Before GREENWOOD, P.J., BILLINGS, J., and GARFF, Senior Judge.[1]

OPINION

GREENWOOD, Presiding Judge:

¶1 Defendant appeals from convictions of one count of second degree felony child abuse, in violation of Utah Code Ann. § 76-5-109(2)(a) (1999),[2] and two counts of class A misdemeanor child abuse, in violation of Utah Code Ann. § 76-5-109(3)(a) (1999). Defendant claims that there is insufficient evidence to support his convictions and that the trial

---

[1] Senior Judge Regnal W. Garff sitting by special appointment pursuant to Utah Code Ann. § 78-2-4(2) (1996); Utah Code Jud. Admin. R3-108(4).

[2] Section 76-5-109 was amended in 1997, 1998, and again in 1999. No substantive changes were made in any of these amendments; we therefore cite to the most recent version of the statute, although defendant was charged with the offenses on May 3, 1996.

court made numerous errors during his trial. We affirm.

## I.  BACKGROUND [3]

¶ 2 Bobbie Dawn Widdison gave birth to a baby girl, B.L., on May 22, 1995, in Delta, Utah. At the time of B.L.'s birth Bobbie had two daughters, C.W. and J.W., who were then two and four years old, from a prior marriage to Jamie Widdison. B.L.'s father was Rick Sanders, a man Bobbie met shortly after her divorce and dated for only three weeks. B.L. was a healthy child during the first several months of her life.

¶ 3 In November of 1995, defendant, Jamie Widdison's brother, moved to Delta from Salt Lake City and began living with Bobbie and her daughters. Bobbie and defendant became boyfriend and girlfriend shortly thereafter. While defendant and Bobbie lived together, neither of them worked regularly outside the home. Defendant was home most days, but occasionally had work or other activities that took him out of the home. Valerie Widdison, a former sister-in-law of both defendant and Bobbie, lived next door and often spent time with them, driving them places and letting them use her phone.

¶ 4 During this time period, Bobbie performed most of the child care for her children. Bobbie changed B.L.'s diapers, took her to doctor's appointments, and took responsibility for dressing and feeding B.L. However, defendant helped care for the children, occasionally feeding and bathing them. Defendant babysat Bobbie's children when she ran errands. Defendant also got up during the night with B.L. to give her bottles and get her back to sleep. Although defendant did not change B.L.'s diapers, he was aware that she had a diaper rash for a long period of time. Defendant was also aware of bruises on B.L. but was not concerned about them.

¶ 5 B.L. began having problems with her ears and with colds in December 1995. B.L.'s paternal grandmother, Meradean Sanders, first noticed bruises on B.L.'s face, a bad diaper rash, and a problem with her nose during a visit with B.L. on January 12, 1996. During that visit, Ms. Sanders took B.L. to the doctor to have her nose and bruises checked. The doctor explained to Ms. Sanders that B.L.'s sore nose was related to her cold and that the bruises looked normal for a child of her age. However, Ms. Sanders had a nurse contact Pam Goodrich, a Division of Child and Family Services caseworker, because she was concerned about B.L.'s condition. Ms. Goodrich began visiting Bobbie's home to check on the health of her children shortly thereafter.

¶ 6 Bobbie testified that, on January 30, 1996, she found B.L. between the mattress, springs, and railing of her crib. Defendant was home when this incident occurred and helped Bobbie remove B.L. from her crib. Because she was concerned about the injuries B.L. received as a result of this incident, Bobbie took B.L. to the doctor. The doctor noted that B.L. had bruises on the right side of her forehead, the left side of her head above the ear, and on her cheekbone under the eye. B.L. also had a raised red mark on the back of her head, a scrape under her chin, and three parallel diagonal red marks on her back.

¶ 7 Ms. Sanders did not see B.L. again until February 9, 1996, when B.L. slept overnight at her house. When Ms. Sanders changed B.L.'s diaper, she noticed that B.L. had a bad diaper rash and bruises all over her face and body. Shortly after Ms. Sanders noticed the bruises, Bobbie called her and explained that B.L. had gotten caught between the mattress and the rails in her crib, causing the bruises.

¶ 8 Ms. Sanders next saw B.L. for an overnight visit on February 11, 1996. When she called to find out if B.L. was ready to begin the visit, she heard a child crying loudly in the background. Bobbie told Ms. Sanders that B.L. was not ready and that she was crying because defendant was washing her face. After taking B.L. to her home, Ms. Sanders noticed that B.L. seemed very uncomfortable and was whimpering. B.L. was so miserable that Ms. Sanders did not change her into her pajamas that night, re-

---

**3.** "On appeal from a jury verdict, we recite the facts and draw inferences in the light most favor- able to the verdict." *State v. Hollen*, 1999 UT App. 123, ¶ 2, 982 P.2d 90.

moving only her jeans. The next day, when Ms. Sanders removed B.L.'s shirt, she noticed that her shoulder was swollen and red. Ms. Sanders took B.L. home and told Bobbie that she needed to take her to the hospital to have the shoulder checked. This was the last time that Ms. Sanders saw B.L. alive.

¶ 9 Bobbie took B.L. to the hospital later that day, and the examining doctor determined that B.L. had a broken clavicle. The doctor wrapped B.L.'s arm and shoulder with a bandage and gave Bobbie medicine for B.L.'s pain. Defendant and Bobbie told several people that B.L. must have broken the bone when she was stuck in her crib or while at her grandmother's house; however, J.W. testified that Bobbie punched the baby in the shoulder. The hospital notified DCFS of the broken clavicle and the caseworker, Ms. Goodrich, arranged to monitor Bobbie's home on a more frequent basis. The caseworker last saw B.L. on February 15, 1996.

¶ 10 On February 21, 1996, defendant ran errands with Bobbie and then babysat B.L. while Bobbie went to the store. At approximately 9:00 p.m., Bobbie gave B.L. her medicine and put her and the other children to bed. Bobbie and defendant then went next door to visit Valerie Widdison, and the three adults played games until late at night. Bobbie and defendant went to check on the children a few times during the night. At approximately 11:00 p.m., Bobbie checked on B.L. and she seemed to be sleeping. At 12:00 a.m. defendant went to check on the children and discovered that B.L. was not breathing. Bobbie called for emergency services and defendant began performing CPR on B.L.

¶ 11 Deputy Brett Nielson arrived at the apartment at approximately 12:20 a.m. on February 22, 1996. As Deputy Nielson entered the apartment, he saw defendant kneeling on the floor next to B.L. Defendant told the deputy that he was performing CPR. The deputy checked for a pulse and found that there was no pulse, the baby's body was rigid, the chest wooden, and lividity appeared to be setting in.

4. The medical examiner explained that the frenulum is a small tag of tissue that begins between

¶ 12 B.L. was transported to the Delta Community Medical Center via ambulance. Emergency room personnel were unable to revive B.L. and she was pronounced dead at 12:26 a.m. Based on the level of rigor mortis and lividity, doctors estimated that B.L. had been dead for two to three hours. The baby had multiple bruises on her face and head, an abrasion on her chin, scratches on her face, a cut on her right elbow, and bruises in the center of her back, on her left arm, on the palm of her left hand, and multiple bruises on her right shin. In addition, the baby had a soiled diaper and a severe case of diaper rash.

¶ 13 After an autopsy, the medical examiner listed B.L.'s cause of death as undetermined. The immediate cause of death was pneumonia; however, the medical examiner testified that the traumatic injuries B.L. suffered contributed to her death. The medical examiner discovered that B.L. had several broken bones, including a broken collar bone (which occurred two to four weeks before death), fractured arms, and a fractured left leg. The injuries to B.L.'s arms were likely caused by someone grabbing and twisting them. The forensic pathologist testified that B.L.'s injuries were not consistent with being trapped in a crib. The medical examiner also discovered that B.L. had a torn frenulum[4] and gums, consistent with someone placing their hand over her mouth and forcibly pushing something such as a pacifier or bottle into her mouth. The medical examiner testified that this injury probably occurred twelve hours before B.L.'s death. The medical examiner testified that the bone fractures and bruises were likely caused by non-accidental trauma.

¶ 14 Defendant and Bobbie were charged, in a joint Information, with B.L.'s murder and several second degree felony and Class A misdemeanor counts of child abuse. The trial court later quashed several of the charges pending against defendant, leaving only one felony count of child abuse for B.L.'s broken clavicle and two misdemeanor counts of child abuse for B.L.'s injured gums and frenulum and B.L.'s diaper rash.

the front teeth and goes up the gums to the inside of the upper lip.

¶ 15 After a two week trial, a jury found defendant guilty of one count of second degree felony child abuse, and two counts of class A misdemeanor child abuse. Defendant now appeals, raising ten issues for our review, challenging: (i) the sufficiency of the evidence; (ii) the admission of evidence of defendant's prior bad acts; (iii) C.W.'s testimony via closed circuit television; (iv) the denial of his motion for a change of venue; (v) the trial court's refusal to admit taped interviews of the child witnesses; (vi) the admission of his former wife's testimony; (vii) the trial court's failure to give the jury his proposed instruction on inferences; (viii) the trial court's failure to grant a mistrial following allegedly prejudicial statements and testimony; (ix) the trial court's denial of his motion for a directed verdict; and (x) argues that we should reverse his conviction for cumulative errors. Each of defendant's claims is addressed below.

## II. ANALYSIS

### A. Sufficiency of the Evidence

¶ 16 Defendant first challenges the sufficiency of the evidence supporting his convictions. He claims that there was insufficient evidence for the jury to find that he had "care or custody" of B.L. or that he acted "knowingly" at the time her injuries were inflicted.

"When examining the sufficiency of the evidence in a criminal jury trial, we begin with the threshold issue of statutory interpretation, which we decide as a matter of law. With regard to the facts, 'we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury.' Under this standard, we will reverse a conviction only when the evidence, viewed in light of our interpretation of the statute, 'is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he [or she] was convicted.' "

*State v. Fisher,* 972 P.2d 90, 97 (Utah Ct. App.1998) (citations omitted) (alteration in original).

¶ 17 Defendant was convicted of one count of felony child abuse based on B.L.'s broken clavicle and two counts of misdemeanor child abuse based on the injury to B.L.'s frenulum and gums and her severe diaper rash. *See* Utah Code Ann. § 76–5–109 (1999). Section 76–5–109(2) & (2)(a) provides that any person who intentionally or knowingly "inflicts upon a child serious physical injury or, having the care or custody of such child, causes or permits another to inflict serious physical injury upon a child is guilty of . . . a felony of the second degree." Section 76–5–109(3) contains the same language but applies to those who inflict or permit another to inflict "physical injury" rather than "serious physical injury." *See id.* § 76–5–109(3).

¶ 18 For purposes of the statute, a person acts knowingly "when he is aware of the nature of his conduct or the existing circumstances. A person acts knowingly, or with knowledge, with respect to his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 76–2–103(2). The statute does not define "care or custody." *See id.* § 76–5–109.

¶ 19 Defendant does not offer a definition of "care," but argues that although B.L. may have been in his "care" at certain times, she was not in his "care" when she was injured. The crux of defendant's argument is that, under the language of the statute, in order to "knowingly" permit B.L.'s abuse, he must have been present with B.L. in his care at the moment her injuries were inflicted. Defendant asserts that he assumed "care" of B.L. only when B.L. was not under her mother's care and that there was insufficient evidence to show that he was present when B.L. was injured. Defendant objects to the State's position that defendant had permanent, long term, continuous care of B.L., and asserts that he did not provide food and shelter for B.L. or act as her permanent caretaker.

¶ 20 The State maintains that, under the language of the statute, defendant had "care or custody" of B.L. because he assumed the role of her caretaker while living in the home. The State further asserts that defendant's constant presence in the home, combined with his assumption of B.L.'s care,

satisfies the language of the statute, regardless of whether he was present at the exact moment B.L.'s injuries were inflicted. Finally, the State argues that the jury was presented with sufficient evidence to determine that defendant was present when the injuries were inflicted.

¶ 21 The meaning of the phrase "having care or custody", as used in section 76–5–109 is a question of first impression. When "construing a statute, our primary purpose ' "is to give effect to the intent of the legislature in light of the purpose the statute was meant to achieve." ' " *Wilson v. Valley Mental Health,* 969 P.2d 416, 418 (Utah 1998) (citations omitted). "[W]e look first to its plain language as the best indicator of the legislature's intent and purpose in passing the statute." *Id.* In reviewing a statute "we presume that the Legislature used each term advisedly, and we give effect to each term according to its ordinary and accepted meaning." *Versluis v. Guaranty Nat'l Cos.,* 842 P.2d 865, 867 (Utah 1992).

¶ 22 "Care" is defined as "charge, supervision, management: responsibility for or attention to safety and well-being." Webster's New Intn'l Dictionary 338 (3rd ed.1986). Under this definition, "care" means accepting responsibility for someone's well being, consistent with this court's holding in *State v. Fisher,* 972 P.2d 90 (Utah Ct.App.1998). In *Fisher,* we determined that the term "caretaker"[5] included a counselor at a wilderness program for troubled youth, explaining that because the counselor "was responsible for [the child's] physical well-being while [the child] was in the Primitive section of the Northstar program ... [the counselor] was an 'other person having under his *care and custody*' a disabled child." *Id.* at 98 (quoting Utah Code Ann. § 76–5–110(1)(b)(i) (Supp.1998)) (emphasis added).

¶ 23 Other jurisdictions have also defined "care" as accepting responsibility for a child. In *State v. Jones,* 188 Ariz. 388, 937 P.2d 310 (1997), *cert. denied, Jones v. Arizona,* 522 U.S. 1054, 118 S.Ct. 705, 139 L.Ed.2d 647 (1998), the Arizona Supreme Court interpreted "care or custody" in that state's child abuse statute to "imply accepting responsibility for a child in some manner." *Id.* at 314 (determining that defendant, who lived with child for three months, provided food and shelter for family, and acted as caregiver and stepfather had "care" of child).

¶ 24 We believe this definition of "care" is consistent with the plain language of section 76–5–109. In this case, the issue is whether there was evidence from which the jury could find that defendant had "care" of B.L. by accepting responsibility for her in some manner. In our view, the jury was presented with sufficient evidence to so conclude. Defendant was extensively involved with B.L.'s life, and in fact assumed a parental role. Defendant lived in the household during the time B.L.'s injuries were inflicted, and because he was not employed he was with Bobbie and B.L. most of the time. While defendant was in the home, he helped care for B.L. and babysat B.L. when Bobbie left the home to run errands. Defendant helped feed and bathe B.L., and got up with her during the night to soothe her back to sleep.

¶ 25 Also, there was evidence from which the jury could find that defendant acted knowingly. While living in the home, defendant saw that B.L. had multiple bruises, beginning in January 1996. Defendant was in the home on January 30, when B.L. allegedly got stuck in her crib and on February 10, when Ms. Sanders called and heard B.L. screaming in the background. Further, defendant was almost constantly with B.L. on the last day of her life—during which the medical examiner estimated her frenulum and gums were injured. Defendant was aware of B.L.'s diaper rash and knew that she had the rash from December until her death in February. As such, the jury was presented with evidence from which it could conclude either that defendant was present when B.L. was abused or that he was aware that Bobbie abused B.L. Therefore, the evidence was sufficient to find defendant guilty of child abuse because he had care of B.L. and knowingly permitted Bobbie to inflict injuries upon B.L.

---

**5.** "Caretaker" is defined as "any parent, legal guardian, or other person having under his care and custody a disabled child." Utah Code Ann. § 76–5–110(1)(b)(i) (1999).

### B. Evidence of Prior Bad Acts

¶ 26 Next, defendant asserts that the trial court improperly admitted statements by C.W., B.L.'s sister, that defendant hit C.W. in the nose, struck her with a belt, and that he and Bobbie spanked B.L. Defendant argues that this evidence was not relevant, that it was improperly admitted under Rule 404(b) of the Utah Rules of Evidence because defendant did not inflict B.L.'s injuries, and that it created prejudice and confusion of the issues. Defendant also argues that admission of this bad act evidence in the State's case violated principles of order of proof.

¶ 27 "When reviewing a trial court's ruling regarding the admissibility of evidence under Rules 403 and 404, this court will sustain the trial court's ruling unless it constitutes an abuse of discretion." *State v. Ramirez*, 924 P.2d 366, 369 (Utah Ct.App. 1996). " 'Improperly admitted evidence requires reversal of a conviction only where we conclude there is a "reasonable likelihood that the error affected the outcome of the proceedings." ' " *State v. Teuscher*, 883 P.2d 922, 926 (Utah Ct.App.1994) (citations omitted).

¶ 28 Under Rule 404(b) of the Utah Rules of Evidence, evidence of a defendant's prior bad acts is not admissible to show the character of the defendant but may be admitted "for other purposes, such as, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Utah R. Evid. 404(b). " '[E]vidence of other offenses may be received, if relevant, for any purpose other than to show a mere propensity or disposition on the part

of the defendant to commit the crime. . . .' " *Teuscher*, 883 P.2d at 926 (citations omitted) (alteration in original).

¶ 29 Defendant asserts that evidence of his prior bad acts was not relevant [6] because the evidence presented at trial proved that his co-defendant, Bobbie Widdison, inflicted B.L.'s injuries. Therefore, evidence that defendant hit C.W. and spanked B.L. does not make any fact of consequence, namely whether he had "care or custody" of B.L. and "knowingly" permitted her abuse, more or less probable. Defendant also contends that because the evidence showed that Bobbie inflicted B.L.'s injuries, his prior bad acts are not relevant to prove identity, opportunity, knowledge, or absence of accident or mistake. Instead, defendant argues that this evidence created prejudice and confusion of the issues.

¶ 30 The State maintains that evidence of defendant's prior bad acts was relevant to show absence of accident or mistake. The State contends that it had to prove both defendants intentionally inflicted or knowingly permitted B.L.'s injures to counter defendants' theory that B.L. was accidentally injured. The State also asserts that the evidence was unlikely to create prejudice or confuse the issues because the trial court gave the jury a cautionary instruction regarding this evidence both at the time it was admitted and at the end of the trial.[7]

¶ 31 Evidence of prior child abuse, both against the victim and other children, is admissible to show identity, intent, or lack of accident or mistake. *See*

---

**6.** " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Utah R. Evid. 401. Relevant evidence is properly admissible. *See* Utah R. Evid. 402.

**7.** The trial court instructed the jury:

In this case I have concluded the State will be able to introduce evidence of other [alleged] wrong [sic] or acts that may be included by the defendants, but they are not charged in the Information in this case. The purpose of allowing that, as I explained with respect to one other witness, is so that the State may use the evidence in their effort to prove that the defen-

dant[s'] identity and tender knowledge, opportunity, motive or absence of accident as to the crimes that have been charged.

You may consider this evidence from these two children today solely for the purposes that I've just explained and may not draw from such evidence the inference that the defendants have a character trait that establishes they probably acted in conformity with that trait.

After the testimony of J.W. and C.W., the trial court corrected the above instruction to state "alleged wrongs or acts" and indicated that he was not commenting on the testimony with the instruction.

*Teuscher,* 883 P.2d at 927–28 (holding evidence defendant broke child's leg, shook child, grabbed children by hair and arms, and put children in closets properly admitted in trial for death of different child). In this case, defendant made several statements before and during trial that B.L.'s injuries were the result of an accident in her crib, requiring the State to prove absence of accident or mistake. Further, although the State concedes on appeal that Bobbie inflicted B.L.'s injuries, this point was not conceded at trial, and thus the identity of the abuser was then at issue. It is likely that admission of this evidence was not error; however, if it was error, the trial court's cautionary instruction limited its effect. Therefore, if error occurred, it was harmless because there is no " ' "reasonable likelihood that the error affected the outcome of the proceedings." ' " *Id.* at 926 (citations omitted).

■ ¶ 32 Finally, defendant contends that admission of this evidence to show absence of mistake or accident in the State's case in chief was prejudicial because it placed the burden of proceeding on the defense and forced defendant to testify. Defendant relies on *State v. Holder,* 694 P.2d 583 (Utah 1984), in making his order of proof objection. The *Holder* court found that the prior bad act evidence at issue in that case was cumulative and highly prejudicial. *See id.* at 585. Only after making this determination did the court consider the order of proof in response to arguments made in the dissent. *See id.* The court explained that the evidence would be admissible after the defendant testified he had no intent or knowledge but did not hold it would have been inadmissible prior to the defendant's testimony. *See id.*

¶ 33 Because the prior bad act evidence at issue here related to defendant's intent or knowledge, it was admissible in the State's case in chief. By pleading not guilty, defendant placed all elements of the crime at issue, including knowledge and intent. *See Teuscher,* 883 P.2d at 927. Therefore, this evidence goes directly to proving the elements of the crime, requiring the State to rely on circumstantial evidence. Further, both defendants made statements to both the police and other witnesses which put absence of mistake or accident at issue. As such, it was necessary and appropriate for the State to introduce this evidence in its case in chief.

## C. Testimony via Closed Circuit Television

■ ¶ 34 Defendant next argues that the trial court erred in allowing C.W. to testify via closed circuit television because there was no evidence that she would suffer serious emotional or mental strain or that her testimony would degrade if she were required to testify in court.[8] Prior to trial, the State made a motion, which defendant opposed, to allow J.W. and C.W., B.L.'s sisters, to testify by videotape. The court appointed an expert to evaluate whether J.W. and C.W. would suffer emotional or mental strain if forced to testify in both defendants' presence.

¶ 35 The court held a hearing on the issue, during which the evaluator testified that both children were less apt to suffer emotional strain if they testified outside defendants' presence. The evaluator further explained that although C.W. could probably testify in defendants' presence without serious emotional strain, she would suffer some emotional strain, and she would not respond fully in their presence.

■ ¶ 36 The trial court found that the children would suffer emotional or mental strain and that their testimony would likely degrade if forced to testify in the presence of defendants. The court issued an order allowing both children to testify outside defendants' presence via closed circuit television. Defendant contends that the evaluator's report and testimony do not support the trial court's finding that C.W. should not testify in the defendants' presence. This court reviews the trial court's factual findings for clear error. *See State v. Alvarez,* 872 P.2d 450, 460–61 (Utah 1994).

¶ 37 Rule 15.5 of the Utah Rules of Criminal Procedure allows the testimony of a child to be televised by closed circuit equipment in

---

8. Defendant does not contest the trial court's ruling on this issue as it relates to J.W.'s testimony.

child abuse cases where "the court determines that the child will suffer serious emotional or mental strain if he is required to testify in the defendant's presence, or that the child's testimony will be inherently unreliable if he is required to testify in the defendant's presence." Utah R.Crim. P. 15.5(2)(a).

¶ 38 The United States Supreme Court evaluated a similar statute allowing children to testify via closed circuit television in *Maryland v. Craig,* 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). The Court determined that this manner of testifying does not violate the Sixth Amendment Confrontation Clause where the trial court "hear[s] evidence and determine[s] whether use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify." *Id.* at 855, 110 S.Ct. at 3169. "The trial court must also find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant." *Id.* at 856, 110 S.Ct. at 3169. In addition, "the trial court must find that the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimis,* i.e., more than 'mere nervousness or excitement or some reluctance to testify.'" *Id.* (citations omitted).

¶ 39 In this case, the trial court's ruling on this issue was not clearly erroneous. The evaluator testified that C.W.'s testimony would degrade, that she would be less responsive, and that she would suffer emotional stress lasting for a few days or weeks if required to testify in defendants' presence. He also explained that C.W. would not give any details, and would be unproductive in relating information in defendants' presence. Further, he testified that he based these findings on defendants' presence, rather than on stress associated with the courtroom in general. Based on this testimony, the trial court's findings that C.W.'s testimony would be unreliable and that she would suffer more than de minimis emotional strain was reasonable.

### D. Venue

¶ 40 Defendant next challenges the trial court's denial of his motion for a change of venue. Defendant claims that he could not receive a fair trial because of pretrial publicity, rumors and gossip surrounding the case, and the small size of the community. The State argues the trial court's ruling on this issue was proper because defendant did not face a biased jury and because he passed the jury panel for cause.

¶ 41 Both the United States Constitution and the Utah Constitution guarantee the right to trial by an impartial jury. *See* U.S. Const. amend. VI; Utah Const. art. I, § 12; *see also* Utah R.Crim. P. 29(e) (detailing procedure for change of venue). This court reviews a trial court's decision to grant or deny a change of venue for abuse of discretion. *See State v. Pearson,* 943 P.2d 1347, 1350 (Utah 1997). "The ultimate test of whether a denial to change venue constitutes an abuse of discretion is whether a defendant was tried by a fair and impartial jury." *State v. Cayer,* 814 P.2d 604, 608 (Utah Ct.App.1991).

¶ 42 Defendant relies on *State v. James,* 767 P.2d 549 (Utah 1989), to support his argument that he was denied a fair trial. In *James,* the defendant was charged with the first degree murder of his three month old son and was granted a change of venue prior to trial after an interlocutory appeal to the Utah Supreme Court. *See id.* at 556. The *James* court detailed four factors for trial courts to consider when making venue determinations: "(1) the standing of the victim and the accused in the community; (2) the size of the community; (3) the nature and gravity of the offense; and (4) the nature and extent of publicity." *Id.* at 552. In holding that a change of venue was appropriate, the court emphasized the fact that the victim was missing for a month and a half and that during this time many members of the community were actively involved in a search for the boy, bringing many members of the community closer to the alleged crime than ordinarily occurs. *See id.* at 554. In addition, the court stated that judicial economy factored into its decision as the matter had not yet been tried. *See id.* at 556.

¶ 43 The case at bar is readily distinguishable from *James*. Though defendant had not lived in the small community of Delta for very long and the victim was a small child, the community involvement here was not comparable to that in *James*. The community was not involved in a search for B.L., nor did it become particularly attached to the story. Further, defendant was not charged with B.L.'s murder but rather with child abuse. Although many people in the jury pool had read newspaper articles about B.L.'s death or had heard about it, the publicity in this case was not comparable to that in *James*. Defendant offers no evidence that he was not tried by a fair and impartial jury. Most importantly, a jury was seated and defendant passed the jury panel for cause. *See Cayer*, 814 P.2d at 608. Thus, the trial court did not abuse its discretion in refusing to grant a change of venue.

### E. Taped Interviews

¶ 44 Defendant next contends that the trial court erred in failing to admit transcripts of police interviews with C.W. and J.W. Defendant argues that the transcripts were admissible as inconsistent statements and that they constituted evidence of the methods used to interview the children.

¶ 45 "In reviewing a trial court's decision to admit evidence, we apply several standards of review." *State v. Jacques*, 924 P.2d 898, 900 (Utah Ct.App.1996). We review the trial court's factual findings underlying a decision to admit evidence for an abuse of discretion and the trial court's legal conclusions for correctness. *See State v. Thurman*, 846 P.2d 1256, 1270 n. 11 (Utah 1993). We " ' "will presume that the discretion of the trial court was properly exercised unless the record clearly shows to the contrary." ' " *State v. Morgan*, 813 P.2d 1207, 1210 n. 4 (Utah Ct.App.1991) (citations omitted).

¶ 46 The trial court initially ruled that the transcripts did not contain inconsistent statements and were therefore inadmissible. The trial court reconsidered its ruling, however, after defense witnesses testified that C.W. told varied stories of the events in question and stated that J.W. told her what happened. Based on this testimony, the trial court allowed defendant to question the officer who interviewed the children regarding the alleged inconsistent statements contained in the transcripts.

¶ 47 Defendant does not cite any authority indicating that the portions of the transcripts not containing inconsistent statements were properly admissible or that the statements were admissible based on the methods used in the interviews. Accordingly, defendant's argument on this issue is moot because the allegedly inconsistent statements in the transcripts were admitted.

### F. Statement to Ex-wife

¶ 48 Defendant claims that the trial court erred by allowing his ex-wife to testify regarding statements he made to her while they were married.[9] Defendant asserts that the statements fell under the marital communications privilege and that they were unfairly prejudicial. The State contends that the statements fell under an exception to the marital communications privilege and were properly admitted.

¶ 49 Rule 502 of the Utah Rules of Evidence sets forth the marital communications privilege:

> An individual has a privilege during the person's life to refuse to testify or to prevent his or her spouse or former spouse from testifying as to any confidential communication made by the individual to the spouse during their marriage and to prevent another from disclosing any such confidential communication.

Utah R. Evid. 502(b)(2). However, an exception to this rule exists "[i]n a proceeding in

---

9. Defendant's ex-wife testified that: defendant took care of B.L. often while he was living with Bobbie Widdison; on one occasion when she was speaking with defendant on the phone, he got very angry and yelled at B.L. when she messed her diaper; defendant told her that B.L. had a broken collar bone from falling in her crib or that she broke the bone at her father's house; defendant told her that B.L. had bruises because she was crawling and ran into things; and that defendant told her that he and Bobbie were going to be charged with B.L.'s murder.

which one spouse is charged with a crime or a tort against the person or property of . . . a person residing in the household of either." Utah R. Evid. 502(b)(4)(C) & (C)(iii). The trial court determined that this exception applied and allowed defendant's ex-wife to testify. This court reviews the trial court's statutory construction for correctness. *See State v. Petersen,* 810 P.2d 421, 424 (Utah 1991).

¶ 50 Defendant does not offer any argument regarding why the above exception does not apply in this case. By its plain language, the exception covers this situation. Although she was married to defendant at the time the communication was made, the ex-wife's testimony was given during a trial charging defendant with inflicting and/or allowing another to inflict injuries to a person living in his home. As such, the trial court correctly determined that the testimony fell under an exception to the marital communications privilege. *See State v. Robertson,* 932 P.2d 1219, 1228–30 (Utah 1997) (holding defendant could not prohibit spouse from testifying when her testimony fell under an exception to Rule 502(b)).

### G. Refusal to Give Jury Instruction

■■■ ¶ 51 Defendant next maintains that the trial court erred by failing to give defendant's requested jury instruction regarding inferences. The requested jury instruction stated:

> The defendant is entitled to every inference in defendant's favor which can be reasonably drawn from the evidence believed by you, and where two inferences may be drawn from the same believed facts, one consistent with guilt and one consistent with innocence, the defendant is entitled to the inference which is consistent with defendant's innocence.

The trial court denied defendant's request, reading the instruction to require the jury to draw all inferences in favor of defendant's innocence.

■■■ ¶ 52 The trial court must "instruct the jury on the law applicable to the facts of the case." *State v. Robertson,* 932 P.2d 1219, 1231 (Utah 1997). " 'Whether the trial court's refusal to give a proposed jury

instruction constitutes error is a question of law, which we may review for correctness.' " *Id.* (quoting *State v. Hamilton,* 827 P.2d 232, 238 (Utah 1992)) (citations omitted). "We review jury instructions in their entirety and will affirm when the instructions taken as a whole fairly instruct the jury on the law applicable to the case." *Id.*

¶ 53 Defendant's requested instruction is not an accurate statement of the law. In *State v. Blubaugh,* 904 P.2d 688 (Utah Ct. App.1995), *cert. denied,* 913 P.2d 749 (Utah 1996), this court reviewed a defendant's claim that reasonable doubt exists if the evidence presents any alternative inference inconsistent with guilt. *See id.* at 694. The *Blubaugh* court rejected this argument, explaining that when two reasonable inferences or hypotheses exist, one consistent with innocence and another consistent with guilt, the jury can conclude that the defendant is guilty beyond a reasonable doubt. *See id.* at 695. As such, defendant's requested instruction which requires the jury to pick the reasonable inference consistent with innocence does not accurately reflect the law.

¶ 54 Furthermore, our review of the jury instructions in their entirety indicates that the jury was properly instructed on the law as it applies to the facts of this case. Accordingly, the trial court's refusal to give defendant's requested instruction on inferences was not in error.

### H. Motions for Mistrial and Motion to Dismiss

■■■ ¶ 55 Defendant next argues that the trial court erred by failing to grant his two motions for mistrial following allegedly improper statements and testimony. Defendant first moved for a mistrial after the State requested the court's permission to treat defendant's former sister-in-law, Valerie Widdison, as a hostile witness in the presence of the jury. Defendant argued that the jury could infer from the State's request that there was a reason to view the witness as biased, and requested a mistrial. The trial court found that the jury had not been unduly tainted by the State's request and denied defendant's motion. The trial court also in-

structed the jury to "disregard any comments that may have been made between counsel and the court before you were excused to the jury room."

¶ 56 Defendant made a second motion for mistrial regarding the testimony of Nikki Greener McDermaid. The State questioned McDermaid about the reason her friendship with Bobbie Widdison ended. McDermaid replied: "Just when she—just when Valerie and Travis were moving down I'd quit because I had heard things that I didn't want, because I didn't want my girl taken away from me. I had heard they were bad news." Defendant made a motion to strike this response in the presence of the jury, which the court granted. The State then questioned McDermaid about her observations of the way Bobbie Widdison cared for B.L. McDermaid responded that Bobbie never had physical contact with her daughter. Defendant made a motion to strike McDermaid's testimony and admonish the jury and moved for a mistrial. The trial court denied the motion for mistrial but ordered the testimony stricken. The trial court further instructed the jury: "I have issued an order that the testimony of Nikki McDermaid, the last witness who spoke, be stricken. You are to disregard entirely and treat as though you never heard the testimony of Nikki Greener, also Nikki McDermaid—whatever her right name is. Do each of you understand that instruction?"

¶ 57 Defendant argues that the evidence forming the basis for the mistrial motions was highly prejudicial and reflected negatively on defendant. This court "will not reverse a trial court's denial of a motion for mistrial absent an abuse of discretion." *State v. Robertson*, 932 P.2d 1219, 1230 (Utah 1997). If the trial court determines that the incident probably did not prejudice the jury, the court should deny the motion. *See id.* at 1230–31. "Unless a review of the record shows that the court's decision is plainly wrong in that the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial, we will not find

that the court's decision was an abuse of discretion." *Id.* at 1231.

¶ 58 Defendant has failed to show the requisite abuse of discretion. The trial court immediately instructed the jury to disregard both incidents and there is nothing in the record to indicate that the jury failed to do so. Review of the record indicates that the prosecutor's statements regarding Valerie Widdison's testimony did not reveal any new information regarding defendant's relationship with Valerie. Further, none of the allegedly objectionable testimony concerned critical events. As such, defendant has not shown that the trial court abused its discretion in denying defendant's motions for a mistrial.

¶ 59 In addition, we conclude the trial court properly denied defendant's motion to dismiss. Because we conclude that sufficient evidence supported the jury's verdict, "we necessarily conclude that the evidence was sufficient to support the trial court's denial of defendant's motion" to dismiss. *State v. Lyman*, 966 P.2d 278, 281 n. 2 (Utah Ct.App.1998).[10]

## CONCLUSION

¶ 60 Sufficient evidence supported defendant's conviction for child abuse. The jury was presented with sufficient evidence to conclude that defendant had "care" of B.L., by accepting responsibility for her in a significant manner, and that based on his almost constant presence in the household, he acted "knowingly."

¶ 61 The trial court did not abuse its discretion in admitting evidence of defendant's prior bad acts to show absence of mistake and knowledge. There is no reasonable likelihood that this evidence affected the outcome of the trial as the trial court's cautionary instruction limited the effect of the evidence.

¶ 62 The trial court's conclusion that C.W.'s testimony would be unreliable and that she would suffer emotional strain if re-

---

**10.** We do not reach defendant's final claim that the cumulative effect of numerous errors warrants reversal because we conclude that defen-

dant failed to establish that any substantial errors were committed.

quired to testify in defendants' presence was reasonable. The trial court did not abuse its discretion in denying defendant's motion for a change of venue as a fair and impartial jury was impaneled. Likewise, the trial court properly allowed defendant's ex-wife to testify at trial under an exception to the marital communications privilege.

¶ 63 Defendant's requested jury instruction on inferences was not an accurate statement of the law. As such, the trial court's refusal to give the instruction was correct, and the jury was properly instructed on the law as it applied to the facts of this case. Finally, the trial court did not abuse its discretion in denying defendant's motions for a mistrial or his motion for a directed verdict. Based on these conclusions, we affirm defendant's conviction.

¶ 64 WE CONCUR: JUDITH M. BILLINGS, Judge, and REGNAL W. GARFF, Senior Judge.